# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Richard Carl Mueller II Individually | : | |
| And as Successor in Interest and | : | |
| Co-Personal Representative | : | |
| Of the Estate of Kayla Jean Mueller | : | |
| | : | |
| and | : | |
| | : | |
| Marsha Jean Muller Individually | : | |
| And as Successor in Interest and | : | |
| Co-Personal Representative | : | |
| Of the Estate of Kayla Jean Mueller | : | |
| | : | |
| and | : | |
| | : | |
| Eric Robert Mueller | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Case No.: _____ |
| | : | |
| SYRIAN ARAB REPUBLIC | : | |
| Damascus, SYRIA | : | |
| Defendant | : | |
| ……………………………………………………: | | |

## COMPLAINT

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign

Immunities Act, 28 U.S.C. § 1602, *et seq.* (hereinafter "FSIA").

### Introduction

1.     This action arises out of the August 4, 2013 abduction of Kayla Jean Mueller, her

subsequent torture and captivity by Islamic State in Syria and the Levant (hereinafter "Daesh"[1])

---

[1] The terrorist group Daesh is also commonly referred to as the Islamic State of Iraq and the
Levant (ISIL), or sometimes as ISIS.  "Daesh" is the Romanization of the Arabic acronym for
ad-Dawlah al-Islāmiyah fīl-ˈIrāq wash-Shām.  Though its literal meaning is the same as the
English acronym "ISIL," many world leaders prefer to use the terms "Daesh" as it is somewhat

and her resultant death in early 2015. At the time, Daesh was operating with the material support

of the Syrian Arab Republic (hereinafter "Syria" or "Assad Regime"). Syrian President Bashar

al-Assad (hereinafter "Assad") and his security apparatus deliberately took steps to help create

and thereafter greatly assisted Daesh in its terrorist operations, which it used as a sham opponent

in the Syrian civil war to bolster Syria's negotiating power against Western powers threatening

the Assad regime. Assad secretly cooperated with Daesh to destroy other opposition groups all

the while declaring war against "terrorists," and feigning meaningful participation in the struggle

against Daesh, and similar groups such as Al Qaeda. At all times relevant to this complaint,

Syria provided material support to Daesh, including but not limited to safe harbor, financial

support, provision of materiel, and military air support. Over this same period, Syria also

provided intelligence and direct instructions to Daesh through embedded intelligence officers.

Without Syria's support, Daesh would not have grown into the terrorist organization that

abducted and murdered journalists and aid workers such as Kayla Mueller.

2.     The abduction and brutal murder of journalists and aid workers such as Kayla

Mueller also benefited the Assad Regime in that these heinous acts shifted the focus of Western

powers from removing the Assad Regime in the aftermath of the Arab Spring to the destruction

of Daesh with the Assad Regime as a necessary ally or a lesser evil. The strategy has proved

extremely successful, and most Western powers refocused their energy on combating Daesh.

3.     Kayla Mueller was the victim of "torture" and "extrajudicial killing," as defined

in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, "hostage taking" as

defined by Article 1 of the International Convention Against the Taking of Hostages,

---

pejorative. "Daesh" is a homophone with the Arabic words Daes ("one who crushes something
underfoot") and Dahes ("one who sows discord"). For similar reasons, we will refer to this
group as "Daesh."

International Convention Against the Taking of Hostages art. 1, June 3, 1983, U.N. Doc.
A/34/46, and suffered "personal injury" and "death" which are compensable under 28 U.S.C. §
1605A.

4.      Kayla Mueller was a loving daughter and sister, who wanted nothing more than to
aid people in need. As a youth, for her tremendous dedication of time and effort to local
philanthropy Kayla received both the Silver and Gold President's Volunteer Service Award as
well as the Yavapai County Youth Philanthropist of the Year Award. Before the plight of Syrian
refugees drew Kayla to the Syrian-Turkish border, Kayla worked for years with refugees in India
and Israel. Subsequently, Kayla worked with Syrian refugees through the humanitarian groups
Support to Life and the Danish Refugee Council.  In a 2013 speech before her hometown
Kiwanis Club, Kayla explained that, "For as long as I live, I will not let this suffering be normal,
something we just accept . . . . It's important to stop and realize what we have, why we have it
and how privileged we are. And from that place, start caring and get a lot done." Her final letter
to her parents, carried out by her cellmates who were released by Daesh, expressed more concern
about what her family must be going through than worry for her own physical safety.

5.      The August 4, 2013 abduction of Kayla Mueller, her subsequent torture and
captivity by Daesh and her resultant death, as well as Syria's material support for Daesh, form
the factual basis for this action.

Plaintiffs state the following in support of their Complaint:

## The Parties

### A.      The Plaintiffs

6.      The Plaintiffs brought this action, by and through their counsel, in the individual
capacity of each Plaintiff and, as appropriate, in their capacity as Co-Personal Representatives of

3

the estate of Kayla Mueller, for their own benefit, and for the benefit of and on behalf of all those legally entitled to assert a claim under the FSIA, state common law, and statutory law.

7.     Plaintiff Richard Carl Mueller II at all times relevant hereto was and is the father of Kayla Mueller.  Richard Carl Mueller II is a citizen of the United States of America who resides in the state of Arizona.  Plaintiff Richard Carl Mueller II can sue and be sued in this court.  Richard Carl Mueller II brings this suit in his own capacity and in his capacity as Co-Personal Representative of the Estate of Kayla Mueller.

8.     Plaintiff Marsha Jean Mueller at all times relevant hereto was and is the mother of Kayla Mueller.  Marsha Jean Mueller is a citizen of the United States of America who resides in the state of Arizona.  Marsha Jean Mueller can sue and be sued in this Court. Marsha Jean Mueller brings this suit in her own capacity and in her capacity as Co-Personal Representative of the Estate of Kayla Mueller.

9.     Plaintiff Eric Robert Mueller at all times relevant hereto was and is the brother of Kayla Mueller.  Eric Robert Mueller is a citizen of the United States of America who resides in the state of Arizona.  Plaintiff Eric Robert Mueller can sue and be sued in this court.


B.     **The Defendant**

10.     Defendant Syria is a foreign state that was designated a state sponsor of terrorism on December 29, 1979, pursuant to section 6 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780.  Syria has remained so designated continuously ever since.

11.     According to the State Department's 2014 Country Reports on Terrorism:

Syrian government awareness and encouragement for many years of violent extremists' transit through Syria to enter Iraq, for the purpose of fighting Coalition Troops, is well documented. Syria was a key hub for foreign fighters en route to Iraq. Those very networks were the seedbed for the violent extremist elements, including ISIS [Daesh], which terrorized the Syrian and Iraqi population in 2014 and – in addition to other terrorist organizations within Syria – continued to attract thousands of foreign terrorist fighters to Syria in 2014 . . . .

As part of a broader strategy during the year, the regime still attempted to portray Syria itself as a victim of terrorism, characterizing all of its armed opponents as "terrorists."[2]

12.     The U.S. Department of State's position at all times relevant to this Complaint was that Assad is "actively seeking to bolster [Daesh] for his own cynical reasons," namely to portray himself to Western powers as a partner in the war on terror, to destroy other anti-Assad militias, and to make his administration a more palatable alternative to Daesh for Syrian minority groups.[3]

13.     Syria has had strong economic ties to Daesh since the group's inception, and as of early 2017 Syria's purchasing of oil represented the single largest source of revenue for Daesh.[4]

## JURISDICTION AND VENUE

14.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A.

---

[2] U.S. DEP'T STATE, BUREAU OF COUNTERTERRORISM, COUNTRY REPORT ON TERRORISM 2014 288 (2015), http://www.state.gov/documents/organization/239631.pdf.

[3] Ruth Sherlock et al., *US Accuses Assad Regime of Helping Islamic State by Targeting Rival Rebels in Strike*, TELEGRAPH (June 2, 2015), http://www.telegraph.co.uk/news/worldnews/islamic-state/11645434/US-accuses-Assad-regime-of-helping-Islamic-State-by-targeting-rival-rebels-in-strikes.html

[4] Feliz Solomon, *Oil and Gas Sales to the Syrian Regime are Now ISIS's Largest Source of Funds*, Report Says, FORTUNE (Jan. 20, 2017), http://fortune.com/2017/01/20/oil-gas-isis-syria-assad.

15.     Pursuant to the FSIA and related statutes, Syria is subject to suit in the courts of the United States as the material supporter of Daesh.  Syria's material support for Daesh caused the abduction, torture, and death of Kayla Mueller.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

17.     28 U.S.C. § 1605A(c) provides a federal private right of action for U.S. citizens against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## THE RISE OF DAESH

18.     In 2004, following the U.S.-led invasion of Iraq, al-Qaeda in Iraq ("AQI"), led by Abu Musab al-Zarqawi ("Zarqawi"), became a leading force in the anti-American insurgency and sectarian war.  AQI, a precursor group to Daesh, distinguished itself through its military effectiveness, brutality against rival Sunni factions, and gruesome murders of Shiite civilians.

19.     AQI's methods caused a backlash within Sunni enclaves, which formed militia groups that often cooperated with U.S. forces against AQI.  AQI eventually lost the support of al-Qaeda "central" and became stigmatized within the Iraqi insurgency and the Sunni community.

20.     Following its loss of influence in Iraq, in January 2006, AQI merged with several terrorist groups to create the Mujahadeen Shura Council.

21.     In June 2006, Zarqawi was killed by U.S. forces in Hibhib, Iraq.

22.     In October 2006, the Mujahadeen Shura Council proclaimed the formation of the Islamic State of Iraq ("ISI"), under the leadership of Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi.

23.     In April 2010, Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi were killed in a joint U.S.-Iraqi operation, and Abu Bakr al-Baghdadi ("al-Baghdadi") took over leadership of ISI.

24.     In April 2013, having merged with the al-Nusra Front and expanded into Syria, ISI adopted the name Islamic State of Iraq and the Levant, also widely known as "Daesh."

25.     This Court has repeatedly found that prior to the rise of Daesh, Syria provided material support to AQI. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191-95 (D.D.C. 2017) (finding after a two-day hearing that Syria "provided material support to the Zarqawi Terrorist Organization's terrorist activity throughout the time period at issue in this case" and taking judicial notice of the same finding by this Court in *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) and *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), aff'd, 646 F.3d 1 (D.C. Cir. 2011)).

26.     Syria, which has a decades-long history of using terrorist groups to achieve its own foreign policy goals, has provided material support to Daesh through each iteration of the group and each generation of leadership, from Zarkawi to al-Masri to al-Baghdadi, facilitating horrific terroristic attacks in Iraq and Syria.  When the Arab Spring came to Syria in January 2011, the Assad Regime came to rely on Daesh for its very existence, as described in greater particularity at paragraphs 27-39.

## SYRIA'S MATERIAL SUPPORT OF DAESH (AKA ISIS/ISIL)

27.     The Assad Regime deliberately facilitated the creation of Daesh from its

precursor groups of ISI and the al-Nusra Front. The Assad Regime provided Daesh with material

support at crucial times during its metastasis from an isolated group of terrorists into a quasi-

terrorist "state" that subsequently kidnapped, tortured, and killed Kayla Mueller. The Assad

Regime remains one of Daesh primary material supporters.

28.     In January 2011, Syrian citizens began peaceful protests as a response to the

region's "Arab Spring."  By March 2011, these protests evolved into massive anti-governmental

opposition rallies and civil disobedience.  By April 2011, Assad's attempts to pacify the

protestors had failed and the Syrian government deployed military forces to suppress the

opposition movement.  This escalation failed.  As the situation spiraled out of control, the Syrian

General Security Directorate deliberately released hundreds of Islamist extremists from prison

from June to October 2011.[5]  Syria's plan was to seed its political dissent and opposition groups

with a radical Islamic terrorist group so it could defeat the West's attempts to support the

opposition groups.  These freed extremists constitute the majority of Daesh's current leadership.[6]

29.     According to a former member of the Syrian Military Intelligence Directorate,

"the [Assad] regime did not just open the door to the prisons and let these extremists out; it

facilitated them in their work, in the creation of armed brigades."[7]  According to this former

Military Intelligence Directorate official, since at least the summer of 2011 Syria embedded

---

[5] Phil Sands et al., *Assad Regime Set Free Extremists from Prison to Fire Up Trouble During Peaceful Uprising*, NAT'L (Jan. 21, 2014), http://www.thenational.ae/world/syria/assad-regime-set-free-extremists-from-prison-to-fire-up-trouble-during-peaceful-uprising#full.

[6] Simon S. Cordall, *How Syria's Assad Helped Forge ISIS*, NEWSWEEK (June 21, 2014), http://www.newsweek.com/how-syrias-assad-helped-forge-isis-255631.

[7] Sands, *supra* note 3.

officers within Daesh and its precursors, as well as within other Islamist groups operating in Syria. Through these officers, Assad directs attacks against other Islamist groups or even against other branches of the Syrian security services.[8] As this former intelligence officer reported, "the regime wanted to tell the world it was fighting Al Qaeda but the revolution was peaceful in the beginning so it had to build an armed Islamic revolt. It was a specific, deliberate plan and it was easy to carry out. There were strong Islamic tendencies to the uprising so it just had to encourage them."[9]

30.     Another former regime official reported that Syria supplied weapons to these freed prisoners, stating, "this is not something I heard rumors about, I actually heard the orders, I have seen it happening. These orders came down from [Military Intelligence] headquarters in Damascus."[10]

31.     As Affaq Ahmad, the former right hand to Syrian Air Force Intelligence Chief, General Jamil Hasad, explained, "actually, the [infiltrated] jihadist groups and brigades were very useful for the regime because they provided a justification for the regime's insistence on a military solution [to the civilian uprising], and provided some legitimacy under the cover of the War on Terror."[11] Ahmad went on to explain that Daesh, acting as a foil for the Assad Regime, not only granted Syria some measure of international legitimacy, it also encourage Syria's non-Sunni minorities to rally around the Assad Regime. Specifically, he stated that certain Islamist groups such as Daesh, "did not cross the red lines that were agreed on by the regime and their

---

[8] *Id.*
[9] *Id.*
[10] Michael Weiss & Hassan Hassan, ISIS: INSIDE THE ARMY OF TERROR (2015).
[11] Michael B. Kelley, *It's Becoming Clear that Assad Fueled the Al-Qaeda Surge that has Kept Him in Power*, BUS. INSIDER (Jan. 21, 2014), http://www.businessinsider.com/assad-helped-build-al-qaeda-in-syria-2014-1.

sponsors. This included the regime accepting the killing by those groups of Alawis and Druze in order to use that to convince these minorities to rally around the regime and hold on to it."[12]

32.     After Assad's creation of Daesh's precursor groups as a cynical political foil in 2011, Syria became one of Daesh's largest trading partners.

33.     In 2013, Daesh fighters captured the oil fields of eastern Syria.  By January 2013, reports corroborated by The Guardian demonstrated that Syria was purchasing oil from Daesh and Daesh affiliates.[13]  Syria has become a mass consumer for the oil that Daesh plunders, which is worthless without such a large-scale buyer.  Considering the array of forces aligned against Daesh, it does not have many potential buyers of its oil, and those few options are limited to those with immediate geographic proximity.  If not Syria, then it would be difficult to see who would be able to purchase Daesh's oil on a mass scale. Oil sales to the Assad regime are now the principal source of revenue for Daesh.

34.     Not only is the Assad Regime a customer for Daesh oil, it is also providing the critical technical expertise required to run some of the oil and gas installations controlled by Daesh.

35.     Commenting on Syria's commercial and logistical support for Daesh, the UK Foreign Secretary stated that "Assad's 'war' on Isil [Daesh] is a sham" and that Assad "supports them financially."[14]  According to Danny Glaser, Assistant Secretary for Terrorist Financing at

---

[12] Michael Weiss, *Assad's No Enemy of al-Qaeda*, NOW (July, 31, 2013),
https://now.mmedia.me/lb/en/commentaryanalysis/assads-no-enemy-of-al-qaeda.
[13] Kelley, *supra* note 9.
[14] *Revealed: The Oil Middleman Between the Syrian Regime and ISIS*, BUS. INSIDER (Mar. 7, 2015), http://www.businessinsider.com/revealed-the-oil-middleman-between-the-syrian-regime-and-isis-2015-3.

the U.S. Treasury Department, "the Assad regime needs the oil, ISIS needs the cash, and they're willing to do business even as they're fighting each other."[15]

36.     In October 2014, the Undersecretary of the Treasury Department, David Cohen, said that oil commerce is a "key source" of Daesh's operating revenue, earning approximately $1 million per day.[16]

37.     In March 2015, the European Union imposed sanctions against George Haswani, a Syrian businessman who, according to the implementing regulations, "provides support and benefits from the [Assad] regime through his role as a middleman in deals for the purchase of oil from [Daesh] by the Syrian regime."[17]

38.     Syria's support for Daesh extends beyond the commercial world.  In June 2015, the United States Department of State found that Syria was launching airstrikes on behalf of the Islamic State in its advance on the Syrian city of Aleppo.[18]  These airstrikes were part of a joint effort by the Assad Regime and Daesh to retake Aleppo from a coalition of Islamist and moderate rebel groups.[19]

---

[15] *This World: World's Richest Terror Army*, (BBC Two television broadcast Apr. 22, 2015), http://www.bbc.co.uk/programmes/b05s4ytp

[16] *Syrian Regime, Iraqi Kurds Among Those Buying ISIS Oil: Official*, NBC NEWS (Oct. 23, 2014), http://www.nbcnews.com/news/world/syrian-regime-iraqi-kurds-among-those-buying-isis-oil-official-n232381.

[17] Council Implementing Regulation 2015/375, 2015 O.J. (L 64) 10 (EU),  http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32015R0375&from=EN.

[18] Erica Wenig, *US Embassy Accuses Syrian Regime of Supporting ISIS Advance*, DAILY CALLER (June 2, 2015), http://dailycaller.com/2015/06/02/us-embassy-accuses-syrian-regime-of-supporting-isis-advance/; Tara Copp, *State: Syria's Assad Directly Supporting ISIS*, WASH. EXAMINER (June 2, 2015), http://www.washingtonexaminer.com/state-syrias-assad-directly-supporting-isis/article/2565466

[19] Alessandria Masi, *Syria's Coming Battle For Aleppo: It's Everybody Against Assad and ISIS*, INT'L BUS. TIMES (June 6, 2015), http://www.ibtimes.com/syrias-coming-battle-aleppo-its-everybody-against-assad-isis-1955134

39.     On June 1, 2015, U.S. State Department spokesperson Marie Harf stated that

"[Assad] does not want to use his forces to root out [Daesh's] safe haven in Syria, but really on

the contrary, is actively seeking to bolster their position for his own cynical reasons."[20]  Daesh

defectors have also confirmed that the Assad's war on Daesh is a sham, reporting that they slept

soundly knowing that Syrian airstrikes would be used to target their opponents, not them.[21]

### DAESH'S ABUDCTION, TORTURE, AND KILLING OF KAYLA MUELLER

40.     On August 3, 2013, aid worker Kayla Mueller accompanied Omar Alkhani, a

contractor for Doctors Without Borders, across the Turkish-Syrian border and into Aleppo,

Syria.

41.     Alkhani had been hired to repair an internet connection at a Doctors Without

Borders hospital in Aleppo. He and Kayla stayed in Aleppo overnight as he finished repairs.

42.     On August 4, 2013 Mueller, Alkhani, a driver, and a Doctors Without Borders

employee travelled by car to an Aleppo bus station. En route, their car was stopped and these

four individuals were pulled out of their vehicle by Daesh fighters. The driver was immediately

released and Alkhani and the Doctors Without Borders employee were released in the following

weeks.

43.     Kayla would spend the remaining 18 months of her life as a Daesh hostage.

44.     On February 8, 2016 the Department of Justice filed a criminal complaint against

Nisreen Assad Ibrahim Bahar (AKA Umm Sayyaf). *United States v. Bahar*, Case No. 16-mj-63

---

[20] Ruth Sherlock et al., *US Accuses Assad Regime of Helping Islamic State by Targeting Rival Rebels in Strikes*, TELEGRAPH (June 2, 2015), http://www.telegraph.co.uk/news/worldnews/islamic-state/11645434/US-accuses-Assad-regime-of-helping-Islamic-State-by-targeting-rival-rebels-in-strikes.html

[21] Michael B. Kelley, *It's Becoming Clear that Assad Fueled the Al-Qaeda Surge that has Kept Him in Power*, BUS. INSIDER (Jan. 21, 2014), http://www.businessinsider.com/assad-helped-build-al-qaeda-in-syria-2014-1

(MSN), Dkt. Nos 1-4 (E.D. Va.). According to the accompanying complaint, Umm Sayyaf was married to Abu Sayyaf, Daesh's minister for oil and gas. *Id*. Umm Sayyaf and her husband forcibly held Kayla Mueller captive in their various residences. Kayla Mueller and other young women held by Umm and Abu Sayyaf "were at various times handcuffed, held in locked rooms, and given orders on a daily basis with respect to their activities, movements, and liberty." *Id*. Additionally, Umm Sayyaf provided Kayla Mueller to Abu Bakr al-Baghdadi, who "sexually abused" Kayla Mueller and "forced her to have sex with him." *Id*.

45.     While in U.S. custody, Umm Sayyaf admitted that "she, along with her husband, was responsible for maintaining custody of Ms. Mueller . . . and others on behalf of ISIL . . . [and] admitted she had sole responsibility for maintaining Ms. Mueller . . . and others in captivity while her husband traveled to address ISIL business." *Id*.

46.     Umm Sayyaf admitted that Abu Bakr al-Baghdadi "owned" Ms. Mueller during the period of time that Ms. Mueller was in captivity at the Sayyaf residence. Umm Sayaff admitted this was "equivalent to slavery." *Id*.

47.     Umm Sayyaf threated to kill Kayla Mueller if she did not obey her. *Id*.

48.     Ms. Mueller remained a hostage of Daesh from her capture in August 2013, until her death. *Id*. Daesh notified Ms. Mueller's family of Ms. Mueller's death in an email communication on or about February 7, 2015. *Id*.

**CLAIM I – ACTION FOR WRONGFUL DEATH**
**(Under 28 U.S.C. § 1605A(c) and**
**State Common Law and State Statutory Law)**

49.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

50.     The death of Kayla Jean Mueller occurred as a direct result of her abduction and captivity by Daesh, which was carried out with the material support of the Syrian Arab Republic. She endured pain and suffering and her estate is entitled to economic damages due to her premature death.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them, for the death of Kayla Jean Mueller on this Claim I, and their costs expended.

## CLAIM II – BATTERY
### (Under 28 U.S.C. § 1605A(c) and State Common Law)

51.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

52.     From August 4, 2013, to around February 7, 2015, Daesh, with the material support of the Syrian Arab Republic, violently and forcefully committed illegal acts during the abduction, torture, and sexual enslavement of Kayla Jean Mueller. These willful, wrongful and intentional acts constitute a battery upon the person of Kayla Jean Mueller, causing injury to her.

53.     As a direct and proximate result of the willful, wrongful and intentional act of Daesh, with the material support of the Syrian Arab Republic, Kayla Jean Mueller was injured in that she endured extreme mental anguish, physical injury, pain and suffering, all to her damage.

**WHEREFORE**, Plaintiffs the Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental

anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment

interest, for each of them, on this Claim II, and their costs expended.

### CLAIM III – ASSAULT
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**

54.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations

set forth in all the forgoing paragraphs as if fully set forth herein.

55.     During, the abduction, and captivity of Kayla Jean Mueller, Daesh, with the

material support of the Syrian Arab Republic, intentionally and willfully put Kayla Jean Mueller

in fear for her life and apprehension of harm and injury as a direct result of the attacker's

physical and mental abuse inflicted upon her.

56.     As a direct and proximate result of the willful, wrongful, and intentional act of

Daesh, with the material support of the Syrian Arab Republic, Kayla Jean Mueller was injured in

that she endured extreme mental anguish, physical injury, and pain and suffering, all to her

damage.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller,

Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against

Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish,

and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for

each of them, on this Claim III, and their costs expended.

### CLAIM IV – FALSE IMPRISONMENT AND KIDNAPPING
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**

57.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations

set forth in all the forgoing paragraphs as if fully set forth herein.

58.     With the material support of the Syrian Arab Republic, Daesh willfully and illegally abducted Kayla Jean Mueller.  The wrongful acts constitute false imprisonment and kidnapping upon the person of Kayla Jean Mueller, causing injury to her.

59.     As a direct and proximate result of the willful, wrongful, and intentional act of Daesh, with the material support of the Syrian Arab Republic, Kayla Jean Mueller was injured in that she endured extreme mental anguish, physical injury, and pain and suffering, all to her damage.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them on this Claim IV, and their costs expended.

## CLAIM V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM
### (Under 28 U.S.C. § 1605A(c) and State Common Law)

60.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

61.     The abduction and sexual enslavement of Kayla Jean Mueller constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

62.     As a direct and proximate result of the willful, wrongful, and intentional act of Daesh, with the material support of the Syrian Arab Republic, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller were injured in

that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them, on this Claim V, and their costs expended.

## CLAIM VI – ACTION FOR SURVIVAL DAMAGES
**(Under 28 U.S.C. § 1605A(c) and
State Common Law and State Statutory Law)**

63.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

64.     Before her death, Kayla Jean Mueller suffered extreme bodily pain and suffering, entitling her Estate to compensatory damages.

**WHEREFORE**, Plaintiff the Estate of Kayla Jean Mueller demands that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, on this Claim VI, and its costs expended.

## CLAIM VII – ACTION FOR CONSPIRACY
**(Under 28 U.S.C. § 1605A(c) and State Common Law)**

65.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

66.     Defendant Syrian Arab Republic did knowingly and willfully conspire with, and agree to materially support Daesh within the meaning of 28 U.S.C. § 1605A, which willfully and

deliberately committed the acts of torture and extrajudicial killing which caused the personal injuries and death of Kayla Jean Mueller.

67.     For the reasons stated above, and having conspired to sponsor Daesh in its execution of this and other illegal acts, Defendant is liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them, on this Claim VII, and their costs expended.

**CLAIM VIII – ACTION FOR AIDING AND ABETTING**
**(Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory law)**

68.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

69.     Defendant Syrian Arab Republic did knowingly and willfully provide substantial assistance and sponsorship to Daesh within the meaning of 28 U.S.C. § 1605A, which caused the personal injury and death of Kayla Jean Mueller.

70.     For the reasons stated above, and having aided and abetted Daesh in these illegal acts, Defendant Syrian Arab Republic is liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller that judgment be entered against Defendant for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them, on this Claim VII, and their costs expended.

## CLAIM IX – PUNITIVE DAMAGES
### (Under 28 U.S.C. § 1605A(c))

71.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

72.     The actions of the Defendant and their agents, as set forth above were intentional and malicious and in willful, wanton, and reckless disregard of the rights and well-being of all Plaintiffs.  All of the acts of Daesh were facilitated by funding, military protection, and arms provided by the Syrian Arab Republic.

73.     Daesh, with the material support of the Syrian Arab Republic carried out the abduction and torture of Kayla Jean Mueller that resulted in her wrongful her death.  Under 28 U.S.C. § 1605A(c), Plaintiffs are entitled to an award of economic damages, solatium, pain and suffering, and punitive damages, and the same is hereby requested against Defendant in accordance with that provision.

**WHEREFORE**, Plaintiffs the Plaintiffs the Estate of Kayla Jean Mueller, Richard Carl Mueller, Marsha Jean Mueller, and Eric Robert Mueller demand that judgment be entered against Defendant for punitive damages in the amount of at least three times the amount of Plaintiff's damages, including their full compensatory damages, which include pre-judgment interest, for these acts of abduction, torture, and extrajudicial killing, on this Claim IX, and their costs expended.

The award of punitive damages, as requested, is to punish Defendant for its conduct in supporting the murderous acts described herein and to serve notice that the rule of law can and will be used to deter state sponsorship of terrorism against citizens of the United States of America.  Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

## ADDITIONAL RELIEF REQUESTED

WHEREFORE, Plaintiffs request joint and several judgments against the Defendants as follows:

1. Awarding to Plaintiffs compensatory, economic, pain and suffering and solatium damages against Defendants in amounts set forth herein and as shall be determined at trial;

2. Awarding to Plaintiffs punitive or exemplary damages against Defendants, jointly and severally, according to proof to be presented at trial;

3. Awarding to Plaintiffs prejudgment interest and post-judgment interest on all damages awards computed and calculated at the maximum rate allowable by law;

4. Awarding to Plaintiffs an explicit and separately quantified adjustment of all damages awards that are based on amounts set in historical precedent, in order to offset the effects of inflation on the value of those awards;

5. Awarding to Plaintiffs their costs, disbursements, expert fees and legal fees;

6. Allowing a *lis pendens* notice of action to issue and be noted and enforced by the Court as against Defendant;

7. Leave to amend this Complaint as the interests of justice may allow; and

8. Granting any and all such further relief as the Court may deem just and proper.

DATED                            Respectfully Submitted,

May 25, 2018                     s/Steven R. Perles_____
                                 Steven R. Perles (Bar No. 326975)
                                 Edward B. MacAllister (Bar No. 494558)
                                 Joshua K. Perles (Bar No. 1031069)
                                 Emily J. Amick (Bar No. 242018)
                                 PERLES LAW FIRM, PC
                                 1050 Connecticut Ave, NW
                                 Suite 500
                                 Washington, DC 20036
                                 Telephone: 202-955-9055
                                 Email: sperles@perleslaw.com