## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RICHARD CARL MUELLER, et al.,

        *Plaintiffs*,

  v.

SYRIAN ARAB REPUBLIC,

        *Defendant*.

Civil Action No. 1:18-cv-01229 (CJN)

### MEMORANDUM OPINION

Kayla Mueller, an American humanitarian aid worker, was kidnapped, tortured, and executed by ISIS.  Plaintiffs here are her mother, father, and brother.  Claiming that the Syrian Arab Republic was responsible for Kayla's injuries and death, they sued Syria under the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602 *et seq.*  Plaintiffs served Syria by diplomatic channels, 28 U.S.C. § 1608(a)(4), and Syria subsequently failed to appear, *id.* § 1608(d).  Plaintiffs therefore now move for default judgment as to liability.  *See* Pls. Mot. for Def. J. as to Liability ("Mot."), ECF. No. 28.  The Court agrees that Plaintiffs have demonstrated most of the elements of their claims, but before the Court can grant that motion, Plaintiffs must submit further briefing on their tort theories of liability.

### I.      Procedural History

Between August 2014 and February 2015, three American hostages—James Foley, Steven Sotloff, and Kayla Mueller—were killed by ISIS.  Sotloff's family was the first to sue Syria in this district, claiming in March 2016 that Syria was responsible for Sotloff's hostage taking, torture, and extrajudicial killing under the terrorism exception to the FSIA.  *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 132 (D.D.C. 2021).  Likewise, in July 2018, Foley's family "sued

Syria for Foley's hostage taking, torture, and extrajudicial killing under the terrorist exception to the FSIA." *Id.* Those two actions were consolidated in September 2018 (hereinafter the *Sotloff* proceedings), and "Syria did not respond to either complaint or otherwise appear." *Id.* The Clerk of Court entered default against Syria in January 2019, and later that year, the plaintiffs in those proceedings moved for default judgment. *Id.* at 132–33. The Court granted the plaintiffs' motion in March 2021. *See generally id.*

This case also followed. Plaintiffs Robert Carl Mueller and Marsha Jean Mueller are Kayla's father and mother; they are suing both in their personal capacities and in their capacities as the co-personal representatives of Kayla's estate. *See* Compl., ECF No. 1, at ¶¶ 7–8. Eric Robert Mueller, Kayla's brother, is suing in his personal capacity only. *Id.* at ¶ 9. Their Complaint alleges wrongful death, battery, assault, false imprisonment and kidnapping, intentional infliction of emotional distress, survival damages conspiracy, aiding and abetting, and punitive damages. *See generally id.*

The Muellers served Syria through the Department of State's diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). *See* ECF No. 16. The diplomatic notes were served on November 12, 2018. *Id.* at 6. Syria thus had until January 11, 2019, to respond to the Complaint, 28 U.S.C. § 1608(d), but it failed to do so. The Clerk of the Court therefore entered default on the Muellers' behalf, ECF No. 19, and the Muellers then moved for entry of a default judgment against Syria as to liability. *See generally* Mot.; 28 U.S.C. § 1608(e).

Before entering default judgment in the *Sotloff* proceedings, Judge Timothy Kelly held a two-day evidentiary hearing in June 2020. *See Sotloff*, 525 F. Supp. 3d at 133. Two experts testified. *Id.* "The first expert, Dr. Daveed Gartenstein-Ross, is an anti-terrorism scholar and author who has worked, in various capacities, on issues related to violent non-state actors for over

a decade." *Id.*  "The Court qualified him as an expert on violent non-state actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supporters." *Id.*  "The second, Dr. Matthew Levitt, is director of the counterterrorism and intelligence program at the Washington Institute, a think tank dedicated to U.S. policy in the Middle East." *Id.*  "The Court qualified him as an expert on the Syrian government's relationship with ISIS's predecessor organizations and ISIS itself between 2010 and 2015."  This testimony is relevant to the current proceedings because the Muellers have asked this Court to take judicial notice of the experts' testimony in the *Sotloff* matter as evidence in this action.  *See infra* at 4–5.

## II.   Facts

The FSIA does not permit the ministerial entry of a default judgment.  Instead, the Court must evaluate the evidence to ensure that Plaintiffs have "establish[ed] [their] claim[s] or right[s] to relief by evidence satisfactory to the [C]ourt."  *See* 28 U.S.C. § 1608(e).  "This requirement imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default." Memorandum Op., *Encinas v. Islamic Republic of Iran*, No. 18-cv-02568, at 3 (D.D.C. Feb. 28, 2022) (quotation omitted).

The Court may look to various sources of evidence to satisfy this statutory obligation, including testimony, documents, and affidavits.  *See id.*  "And a FSIA court may take judicial notice of related proceedings and records in cases before the same court." *Id.* (quotation omitted). Here, the Muellers rely on judicial notice of related proceedings and records, declarations, affidavits, two expert reports, government reports and press releases, ISIS's ransom emails, and public remarks made by U.S. officials.  *See* Exhibits 1–33, ECF Nos. 28-1–38.

The first expert report provides Dr. Gartenstein-Ross's opinion "on the evolution of the Islamic State . . . through the time of Kayla Mueller's death; on ISIS's responsibility for the death

of Kayla Mueller; on the conditions that Mueller faced while held captive by the militant group; and on the Syrian Arab Republic's relationship with ISIS."  Exhibit 1, ECF No. 28-1, at 3 ("Gartenstein-Ross Report").  Dr. Gartenstein-Ross testified on similar matters before Judge Kelly in the *Sotloff* proceedings, *see Sotloff v. Syrian Arab Republic*, 16-cv-724, ECF No. 41 (D.D.C. June 10, 2020) ("Kelly Hr'g Tr. Day 1"), and the Muellers have asked the Court to take judicial notice of that testimony.  *See Mueller*, No. 18-cv-1229, ECF No. 29 at 2 (Proposed Findings of Fact and Conclusions of Law).

The second expert report provides Dr. Levitt's opinion on Syria's support of ISIS and its precursors.  Exhibit 2, ECF No. 28-2, at 1 ("Levitt Report").  Dr. Levitt also testified on similar matters before Judge Kelly in the *Sotloff* proceedings, *see* Kelly Hr'g Tr. Day 1; *Sotloff*, ECF No. 42 ("Kelly Hr'g Tr. Day 2"), and the Muellers have asked the Court to also take judicial notice of that testimony, *see Mueller*, No. 18-cv-1229, ECF No. 29 at 2.

### A.    Judicial Notice of Evidence Produced in Prior Proceedings

"This Court may take judicial notice of facts 'not subject to reasonable dispute' if they are 'generally known within the [Court's] territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Encinas*, *supra*, at 4 (quoting Fed. R. Evid. 201(b)).  This rule permits taking "judicial notice of related proceedings and records in cases before the same court."  *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (quotation omitted).  "Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings."  *Id.*

As many judges on this Court have recognized, "evidentiary problems lurk when taking judicial notice of another court's factual findings in a different case."  *Encinas*, *supra*, at 4.  "Such findings are a court's attempt to determine what happened; they are not a first-hand account of the

4

actual events." *Id.* "As such, they constitute hearsay, and thus are considered inadmissible." *Fain*, 856 F. Supp. 2d at 116.

But courts in FSIA actions "must be mindful that the statutory obligation found in [28 U.S.C.] § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 172 (D.D.C. 2010). And as Judge Lamberth concluded in *Rimkus*, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely on the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.* "This is permissible because the validity of judicial records is generally 'not subject to reasonable dispute,' and such records are perfectly capable of establishing the type and substance of evidence that was presented to earlier courts." *Id.* (citing Fed. R. Evid. 201(b)). The Court agrees, and so will make its own findings of fact while relying on evidence presented in earlier, but related, cases. *See Encinas*, *supra*, at 4–5.

### B.  Findings of Fact

Based on the evidence presented to the Court and the testimonial evidence in the *Sotloff* proceedings, the Court makes the following findings of fact.

### 1.  The Rise of ISIS

"Syria has provided safe haven and support to terrorist organizations within its borders for decades." *Sotloff*, 525 F. Supp. 3d at 127. One such group is the Zarqawi organization, a militant group that originated in the 1990s and—after several name changes—evolved into what we now know as the "Islamic State of Iraq and al-Sham," or "ISIS." Gartenstein-Ross Report at 13. This section includes the Court's findings regarding the history of the Zarqawi organization and its ties

to the Syrian government, relying primarily on the expert report of Dr. Gartenstein-Ross.  *See id.* at 13–23, 44–73.

The namesake of the Zarqawi organization is "Ahmed Fadil al-Nazal al-Khalayleh, better known as Abu Musab al-Zarqawi."  *Id.* at 13.  As a young man, al-Zarqawi "joined the transnational jihadist movement" and trained for combat at a camp in Afghanistan run by al-Qaeda leader Osama bin Laden.  *Id.* at 14.  Al-Zarqawi "built relationships with other jihadists in Afghanistan that allowed him to form the 'Zarqawi organization.'"  *Id.*

The Zarqawi organization began coordinating with al-Qaeda in the early 2000s.  *See id.* at 15–16.  In October 2004, al-Zarqawi pledged an oath of allegiance to bin Laden, at which point his organization became between known as al-Qaeda in Iraq or "AQI."  *Id.* at 17.

The Zarqawi organization soon began coordinating with other jihadist and insurgent groups.  "On January 15, 2006, AQI's deputy emir, Abu Maysarah al-Iraqi, announced the establishment of the . . . Mujahedin Shura Council, or MSC. . . , an umbrella group composed of six Iraqi Sunni militant factions."  *Id.* at 17.  "The main thing MSC accomplished, in addition to providing a cover for AQI, was formalizing longstanding alliances between AQI and lesser-known insurgent groups."  *Id.* at 18.  The establishment of ISIS "can be understood as a continuation of this strategy of rebranding and expansion in an effort to gain greater support and legitimacy not only within the Iraqi insurgent landscape but also the global Muslim community."  *Id.*  Al-Zarqawi died in June 2006, shortly after the creation of MSC.  *Id.*

MSC then rebranded as the Islamic State of Iraq, or "ISI," in October 2006.  *Id.* at 18.  ISI "immediately set out to build a scalable bureaucratic framework that would eventually define the Islamic State during the Syrian civil war."  *Id.* at 18–19 (quotation omitted).  For example, ISI named a cabinet, executed "small-scale public works projects," called for emigration of their

"Muslim brothers," recruited members with administrative and scientific backgrounds, and created an internal political-and-military bureaucracy.  *See id.* at 19.

ISI faced significant setbacks between 2006 and 2010, but the group had a resurgence after the selection of Abu Bakr al-Baghdadi[1] as its new emir in May 2010.  *Id.* at 19–20.  Al-Baghdadi first came into contact with earlier iterations of ISI in January 2006 when his former organization joined MSC.  *Id.* at 17.  "As unrest in Syria mounted in 2011," al-Baghdadi "began laying the groundwork for ISI's western expansion."  *Id.* at 21.  In mid-2013, al-Baghdadi announced the formal merger between ISI and a Syria-based group called Jabhat al-Nusra.  *Id.* at 22.  This new entity was soon renamed the Islamic State of Iraq and al-Sham or "ISIS."  *Id.*

ISIS's control and influence continued to grow.  In January 2014, ISIS took control of the Syrian city of Raqqa.  *Id.* at 23.  And in June of the same year, ISIS seized the Iraqi cities of Mosul and Tikrit.  *Id.*  ISIS "achieved global notoriety by the summer of 2014 for its battlefield victories and wanton brutality, which managed to shock people even in the midst of the world's bloodiest civil war."  *Id.*  It "managed to establish branches, or persuade other militant groups to declare their allegiance to it, in Afghanistan, Algeria, Bangladesh, Egypt, Libya, Nigeria, the Philippines, Somalia, and Yemen."  *Id.*

"One factor that helped propel ISIS's growth was its powerful propaganda machine, which can arguably be described as unprecedented for a violent non-state actor."  *Id.*  ISIS "spread horrific imagery throughout the globe" using "the power of social media and significant advances in DIY video production."  *Id.*  And ISIS "was particularly sadistic in its treatment of people unlucky enough to be captured by the militant group, including . . . journalists."  *Id.*

---

[1] Al-Baghdadi later became the Caliph, or leader, of ISIS and took Kayla Mueller as his slave. Gartenstein-Ross Report at 17, 40–44.

###### 2.      Syria's Relationship with ISIS Before the Arab Spring

Well-documented and credible evidence establishes that, starting as early as 2002, Syria directly and indirectly supported the Zarqawi organization and its many iterations—both before and after the "Arab Spring" protests that "destabilized the region in 2011." *Id.* at 3, 44, 55; *see also Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 147 (D.D.C. 2019) (explaining that in March 2011, "Syria began to experience the effects of the 'Arab Spring'—a wave of protests sweeping through the Middle East and North Africa against authoritarian governments" (citations omitted)).  After the United States invaded Iraq in 2003, the Syrian regime "felt threatened, and believed that its policies of supporting insurgent groups could help prevent a military intervention to topple it."  Gartenstein-Ross Report at 51.  "Syria's considerable support of AQI was intended to undermine coalition efforts in Iraq," and the "desire to see the United States defeated in Iraq was articulated explicitly by Syrian officials."  *Id.* at 44.

"Syria's role as the primary transit point for militants heading to Iraq, as well as a permissive operating environment for Zarqawi network operatives stationed there, has been outlined and verified by insider accounts, official U.S. government statements, captured documents and data, and contemporaneous open-source reporting."  *Id.* at 44.  For example, in March 2003, "U.S. Secretary of Defense Donald Rumsfeld . . . 'accused Syria of allowing military supplies to be transported across its border to Iraq.'"  *Id.* at 45 (quoting Neil MacFarquhar, "A Nation at War: Damascus; Syria Wants U.S. To Lose War, Its Foreign Minister Declares," *New York Times*, March 31, 2003, https://www.nytimes.com/2003/03/31/world/nation-war-damascus-syria-wants-us-lose-war-its-foreign-minister-declares.html).      Additionally, a March 2007 Department of Defense report found that "Syria continues to provide safe haven, border transit, and limited logistical support to some Iraqi insurgents . . . [and] permits former regime elements to engage in organizational activities."  *Id.* at 47 (quoting Department of Defense, *Measuring*

*Stability and Security in Iraq* (March 2007), p. 17).  And a 2014 report from the U.S. Department of State concluded that "Syria had served as a 'key hub' for foreign fighters travelling to Iraq" and explained that "those very networks were the seedbed for the violent extremist elements that terrorized the Syrian population in 2013."  *Id.* at 48 (quoting U.S. Department of State, *Country Reports on Terrorism 2013* (2014), https://2009-2017.state.gov/documents/organization/225050.pdf).

Likewise, substantial evidence demonstrates that Syria provided training, weapons, and money to insurgents headed to Iraq.  Defector Nawaf Fares reported that Assad's brother-in-law, Assif Shawkat, ran an al-Qaeda training camp on the border with Iraq.  *See id.* at 53.  Shawkat was named a Specially Designated National by the U.S. Treasury in 2006; at the time of his designation, Shawkat was the director of Syrian military intelligence.  *Id.* at 54.  Additionally, "in December 2009 Iraqi minister of defense Abd al-Qadir al-Ubaydi stated that 'most of the weapons seized by his ministry's forces' were arriving from Syria, and the regime was 'financing armed groups in Iraq.'"  *Id.* (quoting Al-Sharqiyah television (Arabic), December 12, 2009).

It is therefore unsurprising that U.S. courts have repeatedly held Syria responsible for providing material support to ISIS and the previous iterations of the Zarqawi organization.  *See, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193–95 (D.D.C. 2017) (concluding that Syria was responsible for the Zarqawi organization's 2002 assassination of a U.S. diplomat in Amman Jordan, and the 2004 and 2006 abductions, torture, and executions of two U.S. service members near Baghdad, Iraq).

### 3. Syria's Relationship with ISIS During and After the Arab Spring

During and after the Arab Spring, the same fear of foreign military intervention that drove Assad to support the insurgency in Iraq led him to "provide [] both tacit and explicit support for ISIS, even though ISIS was actively fighting the [Syrian] regime."  Gartenstein-Ross Report at 55.

Assad wanted to "make anti-Assad elements appear as extreme, and hence unpalatable, as possible to the outside world" to stave off foreign intervention.  *Id.* at 55; *see also Sotloff*, 525 F. Supp. 3d at 129 ("[F]earing Western military intervention of the sort that toppled Muammar al-Qaddafi in Libya, Syria's President Bashar al-Assad began supporting the latest iteration of the Zarqawi organization in an effort to paint all of the Syrian opposition as terrorists, and thus make similar action to dislodge his regime harder."  (quotations omitted)).   And the "mechanisms for maintaining a relationship with ISIS were well established due to the Assad regime's previous support for the Zarqawi organization."  Gartenstein-Ross Report at 55.  In this time period, Syria's support of ISIS similarly took several forms, including the systematic release of jihadist prisoners, the purchase of oil and wheat from ISIS, and granting ISIS access to the international banking system.

Syria's release of 1,500 jihadist prisoners was deliberate and related to its fear of foreign intervention.  "In 2011, Assad began releasing inmates en masse from Sednaya prison, one of Syria's most notorious and brutal jails."  *Id.* at 56.  Sednaya Prison was "home to many of the 'battle-hardened Syrian jihadis' who returned to Syria from the war in Iraq in the early 2000s, and was thus widely regarded an 'incubator for jihadism.'"  *Id.* (quoting Rania Abouzeid, "The Jihad Next Door: The Syrian Roots of Iraq's Newest Civil War," *Politico*, June 23, 2014, https://www.politico.com/magazine/story/2014/06/al-qaeda-iraq-syria-108214;   Roy   Gutman, "Assad Henchman: Here's How We Built ISIS," *The Daily Beast*, December 1, 2016, https://www.thedailybeast.com/assad-henchman-heres-how-we-built-isis).   Assad released these prisoners while "protests against his regime were mounting," and "part of the reason for the releases was to strengthen violent extremists."  *Id.*; *see also* U.S. Department of State, Interview, "John Kerry Interview With Gregory Palkot of Fox News," November 17, 2015, https://2009-

2017.state.gov/secretary/remarks/2015/11/249588.htm (Secretary of State John Kerry describing ISIS as, in part, "created by Assad releasing 1,500 prisoners from jail" in order to create a binary choice between Assad and the terrorists); Levitt Report at 10 (describing a report from a former member of Syria's Military Intelligence Directorate that the Syrian regime knew what would result from releasing the terrorist inmates from Sednaya).   "[T]he ability of jihadist groups to immediately capitalize on these releases was fundamentally rooted in Syria's historical relationship with AQI."  Gartenstein-Ross Report at 63.

Some of the released prisoners later became notable leaders in ISIS.  For example, Ali al-Shawaq, also known as Abu Luqman, served as the governor of Raqqa for ISIS.  *Id.* at 57–58.  Luqman brought "hundreds of battle-hardened Nusra fighters with him to ISIS" and used his connections to recruit many more members into ISIS's ranks.  *Id.* at 58.  He was also responsible for helping to entrench ISIS's security state and, at the time of his death in 2018, he was Abu Bakr al-Baghdadi's second in command.  *Id.* at 59.

Another released prisoner was Fiwaz Muhammad al-Kurdi al-Hiju.  Al-Hiju was a friend of Abu Luqman from Sednaya prison and brough Luqman into ISIS.  *Id.* at 57, 59.  Al-Hiju was later appointed as ISIS's first judge in mid-2013.  *Id.* at 60.  He "had the largest record of the death sentences for dissidents and civilians."  *Id.* (quotation omitted).

Amr al Absi was also released from Sednaya in 2011.  *Id.* at 61.  After his release, he became a member of the MSC.  *Id.*  When the MSC's leader fell, al Absi assumed control of the MSC and eventually steered the organization to become part of ISIS.  *Id.*  He was an important recruiter for ISIS and eventually ISIS's governor of Aleppo.  Al Absi was famous for his "zealous use of torture and imprisonment" and was directly involved in the torture and execution of Western

hostages.  *Id.* at 62–63.  And al Absi was also the leader of ISIS's media wing and "was responsible for disseminating propaganda, including ISIS's infamous beheading videos."  *Id.* at 63.

Syria also purchased oil from ISIS; this support was "a particularly important source of revenue for ISIS."  *Id.* at 65.  "In 2014, ISIS made between $150 million to $450 million from oil."  *Id.* at 66.  Much of these sales were done through middlemen on the black market, but there is evidence that the Assad regime purchased oil directly from ISIS.  *See id.* at 67–70; *accord* Levitt Report at 11–14.  There is also evidence that the brokers of the Assad-ISIS trade relationship included Hussam al-Katerji, "a powerful figure in Assad's regime" and an Aleppo parliamentarian. Gartenstein-Ross Report at 72.  Syria thus had a direct financial relationship with ISIS—making it unique among purchasers of ISIS oil.  *Id.* at 69–70; *see also* Kelly Hr'g Tr. Day 1 54:12–15 ("According to numerous accounts, including documents intercepted from ISIS's oil minister, Syria was the biggest consumer of ISIS's oil . . . .").

Syria's purchase of ISIS oil is particularly relevant here.  As discussed below, it was Abu Sayyaf, an ISIS "oil tycoon," who took custody of Kayla in September of 2014, Gartenstein-Ross Report at 71, and used her as his sex slave during the last several months of her captivity.  *See infra* at 15–16.  At that same time, Sayyaf's division reported $40.7 million in revenue from October 25, 2014, to November 23, 2014.  Gartenstein-Ross Report at 71.  More generally, ISIS used its "massive oil revenue" to "undertake all the functions of its state," including "to pay for its fighters, . . . to make military advances, . . . to keep its jails operating and to pay its jailors, . . . to transport prisoners around the country, . . . [and] to fund its media operations."  *See* Kelly Hr'g Tr. Day 1 83:22–84:5.

Syria also purchased ISIS wheat and allowed banks in ISIS-controlled areas to continue to operate, giving ISIS access to international financial system that it otherwise would have been

blocked from.  "The Financial Action Task Force (FATF), an inter-governmental policymaking body of which the United States is a member, issued a report that found that as of February 2015, Syria permitted more than 20 Syrian financial institutions to operate in ISIS-controlled territory." *Sotloff*, 525 F. Supp. 3d at 129–30; *accord* Levitt Report at 14.  "By allowing ISIS to use its banks, Syria provided vital access to the international financial system to ISIS, . . . that allowed it to 'function as a local economy,' *i.e.*, to 'send [money] abroad for purchasing power,' to buy weapons, resources needed to keep the oil industry functioning, and 'things [needed] to run society, the schools and garbage collection and everything else that a militant organization has to take care of when they take over control of territory.'"  *Sotloff*, 525 F. Supp. 3d at 130 (quoting Kelly Hr'g Tr. Day 2 269:10–15, 273:23–274:5).

Consistent with the foregoing evidence, the State Department identified Syria's support for ISIS in its annual Country Reports on Terrorism from 2014 through 2017.  *See* Exhibits 3–6, ECF Nos. 28-3–10; *Sotloff*, 525 F. Supp. 3d at 130–31.

### 4.      ISIS's Capture, Torture, and Execution of American Citizens

Torture of ISIS detainees "typically beg[an] immediately upon the start of captivity[] and last[ed] until execution."  Gartenstein-Ross Report at 26.  ISIS's torture methods included interrogations, psychological torture—including "death threats, solitary confinement, being forced to watch the physical torture and execution of others, threats that the captives would face a similar fate, and mock executions"—and physical torture.  *Id.* at 26–30 (citing Asaad Almohammad, Anne Speckhard & Ahmet S. Yayla, *The ISIS Prison System: Its Structure, Departmental Affiliations, Processes, Conditions, and Practices of Psychological and Physical Torture* (International Center for the Study of Violent Extremism Research Report, August 2017), https://www.icsve.org/the-isis-prison-system-its-structure-departmental-affiliations-processes-conditions-and-practices-of-

psychological-and-physical-torture/ (report based on interviews with 55 defectors and 17 civilians who had been captured and tortured by ISIS)).

Female captives faced another routine form of torture—sex slavery. *Id.* at 30. "ISIS also frequently coerced female hostages into converting to the Islamic faith[] and forced them into 'marriages' with ISIS operatives." *Id.* "ISIS believed that taking female slaves was religiously legitimate," and ISIS's internal documents reveal that the group believed that "the captivity and enslavement of the women of the disbelievers . . . are among the greatest forms of the honour of Islam and its Sharia." *Id.* at 30–31 (quoting Aymenn Jawad al-Tamimi, "Unseen Islamic State Pamphlet on Slavery," Pundicity, December 29, 2015, http://www.aymennjawad.org/2015/12/unseen-islamic-state-pamphlet-on-slavery).

American hostages faced "particularly harsh treatment" by ISIS. *Id.* at 36. "ISIS's treatment of its foreign hostages was partially contingent on whether a hostage's government would be willing to pay ransom for his or her release." *Id.* Britain's and the U.S.'s policies against negotiating with terrorists "meant that American and British hostages were among the worst treated of all [ISIS] captives," and is consistent with the lowest and second-lowest hostage release rates. *Id.*

### 5. ISIS's Capture, Torture, and Execution of Kayla Mueller

Kayla Jean Mueller was a U.S. citizen who "traveled to the Middle East shortly after the Syrian civil war broke out to help established aid organizations provide assistance to Syrian refugees." *Id.* at 23. She was kidnapped at gunpoint by masked ISIS soldiers on August 4, 2013, while travelling in northern Syria with a Syrian colleague contracting for Doctors Without Borders. Ex. 24, ECF No. 28-28, at ¶ 7 (Affidavit of Special Agent William H. Heaney); Gartenstein-Ross Report at 23–24. During the first six months of her captivity, she was primarily held in isolation. *See* Gartenstein-Ross Report at 37–38 (citing James Gordon Meek et al., "Kayla Mueller in

Captivity: Courage, Selflessness as She Defended Christian Faith to ISIS Executioner 'Jihadi John,'" ABC News, August 25, 2016, https://abcnews.go.com/International/kayla-mueller-captivity-courage-selflessness-defended-christian-faith/story?id=41626763).   She was moved several times to different temporary holding locations in Syria, *id.* at 38, including the prison in the basement of the Aleppo Eye Hospital where Nicholas Henin, James Foley, and Steven Sotloff were also held.  Ex. 11R, ECF No. 28-16, at ¶ 26 (Declaration of Nicholas Henin).  These three men heard Kayla beg her captors not to hurt her.  *Id.*  All four were later moved to Raqqa, and Kayla was brought to the cell shared by Henin, Foley, and Sotloff to provide a proof of life for Henin before he was released.  *Id.*  at ¶¶ 27–29.[2]  While in Raqqa, Kayla was held in a small, hot cell with other prisoners and given very little to eat.  Gartenstein-Ross Report at 39–40.  Kayla was also taunted for being a Christian and "her jailers may have tried to coercively convert her." *Id.* at 39.

ISIS began to reach out to Kayla's parents by email in May 2014.  Ex. 28R, ECF No. 28-32, at 2–12.  ISIS repeatedly demanded the release of Dr. Afia Siddiqi, a U.S. prisoner convicted of the attempted murder of U.S. officers and employees, or £5 million in cash.  *Id.* at 3, 7.  ISIS threatened to kill Kayla unless its demands were met.  *Id.* at 4, 9.

In September 2014, Kayla and two kidnapped Kurdish women of Yazidi Heritage were transferred from an ISIS prison to the custody of Umm Sayyaf and her husband, Abu Sayyaf.  Ex. 24 at ¶¶7–9.  As noted above, Abu Sayyaf was ISIS's minister for oil and gas; he reported directly to ISIS's leader, Abu Bakr al-Baghdadi.  *Id.* ¶ 9.  According to statements made by Umm Sayyaf to the FBI, Kayla and her co-captives were handcuffed, locked in their rooms, and deprived of

---

[2] ISIS released Henin in April 2014.  Ex. 11 at ¶ 7.  Foley and Sotloff were beheaded by ISIS in the early fall of 2014.  Gartenstein-Ross Report at 39–40.

their freedom in the Sayyaf residence. *Id.* ¶ 10. They were threatened with death for disobedience and shown violent ISIS propaganda videos. *Id.* ¶ 10, 12. The captive women were also considered to be "owned" by the ISIS men who "acquired" them. *Id.* ¶ 10.

Abu Bakr al-Baghdadi "owned" Kayla during her captivity at the Sayyaf residence. *Id.* ¶18. "While in captivity, Kayla Jean Mueller was sexually abused by Baghdadi, who forced her to have sex with him." *Id.* ¶10; *accord* Gartenstein-Ross Report at 24 ("Around September 2014, Abu Bakr al-Baghdadi took Mueller as one of his sex slaves, and, until her death on or before February 6, 2015, held her prisoner in the homes of several ISIS leaders, including his own.").

ISIS reported Kayla's death in February 2015. Gartenstein-Ross Report at 24. ISIS claimed at that time that Kayla was killed in a Jordanian airstrike. *Id.* But credible statements from ISIS insiders—two women involved in Kayla's captivity—demonstrate that it is more likely that Kayla was executed by ISIS. *See id.* at 24–25.

In particular, Umm Sayyaf told the FBI that "Baghdadi and ISIS spokesman Abu Muhammad al-Adnani ordered [Kayla] Mueller's execution because she knew their identities and constituted a security risk." *Id.* at 25. Umm Sayyaf told the FBI that she heard this information from her husband just a few weeks after Kayla's death and she judged his statement to be credible. *Id.*

Umm Sayyaf's claim that ISIS executed Kayla is "bolstered by those of a former sex slave of a high-ranking ISIS leader, an unnamed Yazidi woman," who reported to the BBC that she remembers that ISIS leader "laughing at the news reports that Kayla was killed in a coalition airstrike." *Id.* The ISIS leader told the Yazidi woman that ISIS killed Kayla for revenge because she was an American. *Id.* at 25–26.

### III.    Legal Standards

Courts are permitted to enter default judgments against parties who fail to appear before them.  Fed. R. Civ. P. 55(b)(2).  But as noted above the "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  The Court has the "affirmative obligation" to ensure that it has subject matter jurisdiction over the action and personal jurisdiction over the defendant.  *See Sotloff*, 525 F. Supp. 3d at 133 (quotation omitted).

Additionally, "[w]hen default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'"  *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)).  Because "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and the Court of Appeals has instructed that "courts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to . . . differing situations," *id.* (quotation omitted), the standard of proof in FSIA default judgment actions is more lenient.

Therefore, "[i]n a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding."  *Sotloff*, 525 F. Supp. 3d at 134 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds*, 140 S. Ct. 1601 (2020) (citations omitted)).   "[U]ncontroverted factual allegations supported by admissible evidence may be taken as true," *id.*, and § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge."  *Owens*, 864 F.3d at 785.  "And this discretion extends to the admission of expert testimony, often 'of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible,

to obtain,' '[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences,' and '[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection.'" *Sotloff*, 525 F. Supp. 3d at 134 (quoting *Owens*, 864 F.3d at 787).

## IV.     Conclusions of Law

Based on the above findings of fact, *see* Part II(B), the Court makes the following conclusions of law.

### A.  The Court Has Jurisdiction Over This Action

The Court is satisfied that it has subject matter, original, and personal jurisdiction over this action.  Because both personal and original jurisdiction turn on whether this Court has subject matter jurisdiction, the Court begins there.

### 1.     Subject Matter Jurisdiction

The FSIA state-sponsored-terrorism exception provides federal courts with subject matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" certain acts of terrorism against U.S. nationals.  28 U.S.C. § 1605A(a)(1)–(2).  The Muellers must prove four elements to establish that the Court has subject matter jurisdiction over this action: (1) Syria "was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed;" (2) Kayla and the Muellers were U.S. nationals at the time of the acts of terrorism; (3) the Muellers afforded Syria a reasonable chance to arbitrate their claims; and (4) Syria's actions qualify under the terrorism exception of the FSIA as defined in 28 U.S.C. § 1605A(a)(1).  *See Sotloff*, 525 F. Supp. 3d at 134; 28 U.S.C. § 1605A(a)(1)–(2).  The Muellers have proven all four elements.

First, Syria was a designated state-sponsor of terrorism at all relevant times.  The United States first designated Syria as a state-sponsor of terrorism in 1979 and has continued to designate Syria as a state-sponsor of terrorism since, including during the time of the acts of terrorism against

Kayla and when they filed this suit. *See* State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (explaining that Syria was designated as a state sponsor of terrorism in 1979 and continues to be so designated).

Second, all of the Muellers were United States citizens at the relevant times, *see* Ex. 12, ECF No. 28-17 (Affidavit of Marsha Jean Mueller), and thus were U.S. nationals within the meaning of the FSIA. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

Third, the Muellers offered to arbitrate their claims against Syria. "The FSIA does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity." *Sotloff*, 525 F. Supp. 3d at 135 (quotations omitted). The Muellers sent an offer to arbitrate, a translation of that letter in Arabic, and a copy and translation of the complaint to the Syrian Ministry of Foreign Affairs. *See* Ex. 14, ECF No. 28-18, at ¶ 5 (Affidavit of Emily Amick). These actions fulfilled the Muellers' duty to extend a "reasonable opportunity" to Syria to arbitrate.

Finally, Syria's actions qualify under the terrorism exception of the FSIA. *See* 28 U.S.C. § 1605A(a)(1). "The fourth element of subject-matter jurisdiction under the FSIA terrorism exception is that the plaintiffs seek [money] damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Sotloff*, 525 F. Supp. 3d at 135 (quoting 28 U.S.C. § 1605A(a)(1)). Because the Muellers seek money damages, *see* 28 U.S.C. § 1605A(c) ("[Money] damages may include economic damages, solatium, pain and suffering, and punitive damages."), and because they have demonstrated that Kayla suffered hostage taking, torture, and extrajudicial killing at the hands of ISIS and that Syria caused these injuries by providing material support and resources to ISIS, the Muellers have carried their burden.

a.      *Hostage Taking*

The FSIA defines "hostage taking" by reference to Article 1 of the International Convention against the Taking of Hostages, which states:

> Any person who seizes or detains and threatens to kill, to injure, or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages.

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205.  Hostage taking has two elements:  (1) the abduction or detention and (2) the purpose of accomplishing the third-party compulsion described in the definition provided by the Convention.  *See Sotloff*, 525 F. Supp. 3d at 135.

The Mueller have satisfied both elements.  The evidence submitted by the Muellers—including the Gartenstein-Ross report, the emails between ISIS and Carl Mueller, the statements of Umm Sayyaf to the FBI, the declaration of Nicholas Henin, and the testimony of the Yazidi woman—shows that Kayla was abducted by ISIS and held in captivity until her death.  *See supra* at 14–16.  And the emails between ISIS and Carl Mueller show that the purpose of Kayla's captivity and detention was to try to extract either a prisoner exchange between the U.S. and ISIS or £5 million from the Muellers.  *See generally* Ex. 28R.  In addition, as Dr. Gartenstein-Ross put it, "ISIS took hostages and treated them so brutally for the broader purpose of 'send[ing] [a] message and . . . giv[ing] it complete control over populations and prisoners who fell under its control.'"  *Sotloff*, 525 F. Supp. 3d at 136 (quoting Kelly Hr'g Tr. Day 1 92:22–93:2).

b.      *Torture*

The FSIA defines "torture" by reference to the Torture Victim Protection Act ("TVPA"). 28 U.S.C. § 1605A(h)(7).  Under that statute,

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

    (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

    (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

    (C) the threat of imminent death; or

    (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 § 3(b), Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 (note).  "To establish torture, the plaintiffs must also show that the conduct was sufficiently severe and purposeful."  *Sotloff*, 525 F. Supp. 3d at 137.

The Muellers have certainly established that Kayla was tortured by ISIS.  As an initial matter, as Dr. Gartenstein-Ross testified, "[n]obody who escaped from ISIS's imprisonment has ever reported not being tortured."  Kelly Hr'g Tr. Day 1 93:12–13.  Credible evidence establishes that Kayla was subjected to prolonged periods of solitary confinement, Gartenstein-Ross Report at 37–38, miserable living conditions, *see id.* at 39–40, death threats, Ex. 24 at ¶12, and sexual abuse, *id.* ¶10; *accord* Gartenstein-Ross Report at 24.  And credible evidence establishes that Kayla was subjected to these different forms of mistreatment because she was American and, sometimes,

because she was a Christian.  Gartenstein-Ross Report at 25–26, 39.  This evidence is more than enough to show that ISIS tortured Kayla at such a severe level and with sufficient purpose to meet the definition outlined in the TVPA.

        *c.*    *Extrajudicial Killing*

"The state-sponsored terrorism exception to the FSIA also defines 'extrajudicial killing' through reference to the TVPA."  *Sotloff*, 525 F. Supp. 3d at 137 (citing 28 U.S.C. § 1605A(h)(7)).  The TVPA defines extrajudicial killing as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA § 3(a).  This definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

Although there is some evidence to the contrary, the evidence shows that ISIS deliberately killed Kayla because she was a security threat to ISIS.  *See supra* at 15–16.  The Court concludes that the statements of Umm Sayyaf and the Yazidi woman that Kayla was intentionally killed by ISIS for this reason are more credible than the statements of ISIS that she died in an airstrike.  *See id.*

        *d.*    *Material Support and Causation*

"The final requirement under § 1605 is a showing that [Kayla Mueller's] abduction, torture, and [execution] were 'caused by. . . the provision of material support or resources' to ISIS by 'an official, employee, or agent' of Syria."  *Sotloff*, 525 F. Supp. 3d at 138 (quoting 28 U.S.C. § 1605A(a)(1)).  The FSIA defines "material support" by way of 18 U.S.C. § 2339A:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); *see also* 28 U.S.C. § 1605(h)(3). The FSIA only requires a plaintiff to show proximate cause. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). The Muellers can establish proximate cause by showing "a reasonable connection between the material support provided and the ultimate act of terrorism." *Foley*, 249 F. Supp. 3d at 204 (quotation omitted). "More specifically, [the Muellers] must establish (1) that Syria's provision of material support was a 'substantial factor in the sequence of events' that led to [Kayla's] hostage taking, torture, and extrajudicial killing, and (2) that what happened to [Kayla] was 'reasonably foreseeable or anticipated as a natural consequence of [Syria's] conduct.'" *See Sotloff*, 525 F. Supp. 3d at 139 (quoting *Owens* 864 F.3d at 794).

To begin, the evidence establishes that Syria provided material support to ISIS. Based on the findings of fact above, the Court concludes that Syria provided ISIS material support through the release of prisoners and through financial assistance in the form of oil purchases, wheat purchases, and access to the international financial system. *See supra* at Part II(B)(3); *see also Sotloff*, 525 F. Supp. 3d at 138–39. Syria also provided material support to ISIS's precursors by operating as a primary transit point for jihadist fighters, as well as training, weapons, and money to insurgents headed to Iraq. *See supra* at Part II(B)(2). These actions constitute material support in the form of "currency or monetary instruments or financial securities," "financial services," "training, expert advice or assistance," "weapons," and "transportation." *See* 18 U.S.C. § 2339A(b)(1).

Second, the Court concludes that Syria's aid to ISIS was at least a substantial factor in the sequence of events that led to Kayla's hostage taking, torture, and extrajudicial killing. Syria's "mechanisms for maintaining a relationship with ISIS were well established" by the time of the Arab Spring "due to the Assad regime's previous support for the Zarqawi organization." Gartenstein-Ross Report at 55. And Syria's support of ISIS after the Arab Spring, and during the time of Kayla's captivity and death, included the release of prisoners who became key leaders of ISIS and who were responsible for its growth and success, the provision of a significant proportion of ISIS's financial resources, and the connection to the international banking system. *Id.* at 55–73.

Finally, the actions of ISIS were reasonably foreseeable to Syria. As Dr. Levitt put it, "[t]here is no question—absolutely no question that the Assad regime knew; expected; wanted the Islamic State to engage in acts of abhorrent violence [such as those inflicted on Ms. Mueller] specifically so that it would become a worse boogeyman than the Syrian Regime." Kelly Hr'g Tr. Day 2 291:22–292:1.

The evidence therefore establishes that (1) Syria "was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed;" (2) Kayla and the Muellers were U.S. nationals at the time of the acts of terrorism; (3) the Muellers afforded Syria a reasonable chance to arbitrate their claims; and (4) Syria's actions qualify under the terrorism exception of the FSIA as defined in 28 U.S.C. § 1605A(a)(1), *see Sotloff*, 525 F. Supp. 3d at 134; 28 U.S.C. § 1605A(a)(1)–(2). The Court has subject matter jurisdiction over this action.

### 2.     Original Jurisdiction

"Under 28 U.S.C. § 1330, federal district courts have original jurisdiction over FSIA claims that are (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity under 28 U.S.C. §§ 1605, 1606, 1607,

or any applicable international agreement." *Encinas*, *supra*, at 17 (citing 28 U.S.C. § 1330(a)). The Muellers have not sought a jury trial, *see generally* Compl.; the suit is brought against Syria in its capacity as a legal person, not against property; Syria is a foreign state; and Syria is not entitled to sovereign immunity because this action falls under the state-sponsored-terrorism exception in the FSIA. *See supra* Part IV(A)(1). The Court therefore has original jurisdiction over this action.

### 3.  Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, the Court must also have personal jurisdiction. *Sotloff*, 525 F. Supp. 3d at 140. The Court has personal jurisdiction over Syria if it (1) has original jurisdiction under the FSIA; and (2) Syria was properly served under the FSIA. 28 U.S.C. § 1330(b). Because the Muellers "have already satisfied the first requirement, the Court turns to the second." *Sotloff*, 525 F. Supp. 3d at 140.

The FSIA provides four methods of serving a foreign state, as well as the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention

of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  "Because Syria does not have a special arrangement for service with [the Muellers], nor is it a party to an international convention on service, [the Muellers] did not need to attempt service in accordance with § 1608(a)(1) or (a)(2)."  *See Sotloff*, 525 F. Supp. 3d at 141. The Muellers attempted to serve Syria under § 1608(a)(3) in July 2018.  *See* ECF Nos. 7, 11.  When service failed, the Muellers served Syria under § 1608(a)(4) by diplomatic note forwarded by the State Department to the Foreign Interests Section of the Embassy of the Czech Republic in Damascus.  *See* ECF No. 16.  "Although Syria refused to accept delivery, service was still proper." *See Sotloff*, 525 F. Supp. 3d at 141; *see also* ECF No. 16 at 5 (explaining that Syria refused to accept delivery).

The Court therefore has personal jurisdiction over Syria under 28 U.S.C. § 1330(b).

### B.    The Court Needs Additional Briefing on Plaintiffs' Tort Claims

The FSIA creates a private right of action for victims of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  "The right of action requires a demonstration (1) that [the] victim suffered an act of torture, extrajudicial killing, aircraft sabotage, hostage taking . . . ; (2) that the act was committed, or the provision [of material support or resources was] provided, by the foreign state or its agent; and that the act (3) caused (4) personal injury or death (5) for which the courts of the United States may maintain jurisdiction under this section for money damages."  *Encinas*, *supra*, at 19 (quotations omitted).  "The third and fourth prongs require [the Muellers] to articulate a way to recover through the lens of civil-tort liability."  *Id.* at 20.

"Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that Plaintiffs are entitled to relief."  *See Sotloff*, 525 F. Supp. 3d at 141 (citing

28 U.S.C. § 605A(c)).  As explained above, the evidence establishes that Kayla was the victim of hostage taking, torture, and extrajudicial killing, *see supra* Part IV(A)(1)(a)–(c); that Syria provided material support to ISIS, *see supra* Part IV(A)(1)(d); and that the Court has jurisdiction. *See supra* Part IV(A).

All that is left is whether the Muellers have satisfied the third and fourth elements—which, again, are evaluated "through the lens of civil-tort liability." *Encinas*, *supra*, at 20.  "The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs to prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered." *Fain*, 856 F. Supp. 2d at 122 (quotation omitted); *accord Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 176 (D.D.C. 2019) ("[A]lthough section 1605A creates a private right of action for claimants who meet its other requirements, a FSIA plaintiff must further 'prove a theory of liability' to establish a claim for relief that entitles them to damages." (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010)) (citation omitted)).  "Based on the Circuit Court's guidance, District Courts in this jurisdiction 'rely on well-established principles of law, such as those found Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to outline the boundaries of these theories of recovery." *Encinas*, *supra*, at 21–22 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

The Complaint appears to include nine possible claims for relief: wrongful death, assault, battery, false imprisonment and kidnapping, intentional infliction of emotional distress including solatium, survival damages, conspiracy, aiding and abetting, and punitive damages.  *See generally* Compl.  Plaintiffs' Motion, however, does not discuss the elements of those claims, which Plaintiff brings which claim, or how the evidence satisfies the elements of those claims.  *See generally* Mot.

The Court therefore orders Plaintiffs to submit supplemental briefing that "articulate[s] the justification for such recovery . . . through the lens of civil tort liability." *See Rimkus*, 750 F. Supp. 2d at 176.  For each claim alleged in the Complaint, the briefing should address its elements, the evidence that satisfies each element, and which Plaintiff can recover for that claim.

## V.    Conclusion

The Muellers moved for default judgment as to liability only.  *See* Mot. at 1.  In order finally to decide the question of liability, the Court requires the additional briefing discussed above.  Plaintiffs are therefore ORDERED to submit the additional briefing by March 1, 2023.

DATE:  January 31, 2023

CARL J. NICHOLS
United States District Judge