## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD CARL MUELLER, et al., | ) |
| | ) |
| *Plaintiffs*, | ) CA NO 1:18-cv-01229 (CJN) |
| | ) |
| v. | ) |
| | ) |
| SYRIAN ARAB REPUBLIC | ) |
| | ) |
| *Defendant*. | ) |

## REPORT AND RECOMMENDATION OF THE
## SPECIAL MASTER REGARDING COMPENSATORY DAMAGES

This case arises out of the kidnapping, torture, and execution of Kayla Mueller, a humanitarian aid worker, by ISIS. Kayla Mueller's father, mother, and brother, brought this action against the Syrian Arab Republic under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.* Kayla Mueller was one of three American hostages executed by ISIS in 2014 and 2015. The families of the other two such hostages – Stephen Sotloff and James Foley – also brought actions under the FSIA. These two actions were consolidated. *See Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 (D.D.C. 2021) ("*Sotloff I*"). The instant action has proceeded separately but the evidence adduced in the *Sotloff* matter is relevant and was considered by this Court in determining liability. *See Mueller v. Syrian Arab Republic*, ECF No. 32 ("Liability Opinion 1").

The Court appointed the undersigned as Special Master for the administration of damages proceedings, to receive evidence, and to prepare proposed findings and recommendations for the disposition of Plaintiffs' claims for compensatory damages in this matter. Order, ECF No. 37. After entry of the Court's appointment order, Plaintiffs submitted additional evidence and

documentation in support of the evaluation of compensatory damages including deposition testimony of the family members of the victim, an economic loss report, and an expert psychological report.  I have reviewed the relevant pleadings, the sworn testimony provided by the family member Plaintiffs, the expert reports, evidence submitted in support of Plaintiffs' Motion for Default Judgment as to Liability, ECF No. 28, the Court's Memorandum Opinions on Liability, ECF Nos. 32 ("Liability Opinion 1") and 34 ("Liability Opinion 2"), and applicable case law.  My Report and Recommendation is based on the above-described information, evidence, and applicable case law.  In addition, I provided a report and recommendation on compensatory damages in the Sotloff matter and as a result I am familiar with the evidence submitted in that case regarding the circumstances of abduction and torture employed by ISIS in Syria during the 2014-2015 time period.

## BRIEF BACKGROUND

Section 1605A(a) of the FSIA creates a private right of action for United States nationals, members of the U.S. armed forces, and United States government employees or contractors who are injured or killed by terrorist acts carried out by officials, employees, or agents of a foreign state.  28 U.S.C. § 1605A(a).  Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.[1]

The determination of the appropriate amount of compensatory damages depends on the specific facts and circumstances of the case and the evidence submitted.  In evaluating the claims for damages, I am entitled to rely on uncontroverted factual allegations that are supported by sworn

---

[1] All of the Plaintiffs are United States citizens and thus all are eligible to assert claims under the FSIA.  *See* Liability Opinion 1 at 19.

testimony – affidavit, declaration or deposition testimony – and expert reports. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

The first section of this Report sets forth factual findings with respect to each Plaintiff. Next, I set forth the applicable legal standards and apply those standards to the factual findings to provide recommended damages awards for each Plaintiff.

**FACTUAL FINDINGS**

The Plaintiffs in this case are the Estate of Kayla Mueller and Kayla Mueller's immediate family members: Kayla's mother, Marsha Jean Mueller, her father, Richard Carl Mueller, and her brother, Eric Robert Mueller. Marsha Jean Mueller and Richard Carl Mueller brought suit as co-personal representatives of the Estate of Kayla Mueller and in their personal capacities. Eric Mueller brought suit in his personal capacity for his own damages.

**A.      DIRECT VICTIM KAYLA MUELLER.**

Kayla Mueller was an "American humanitarian aid worker," who "was kidnapped, tortured, and executed by ISIS." Liability Opinion 1 at 1. Kayla went to Syria at the onset of its civil war to work with humanitarian organizations assisting Syrian families. *Id.* at 14. On August 4, 2013, while in northern Syria, Kayla was kidnapped at gunpoint by ISIS soldiers. *Id.* at 14. She was 24 years old at the time. She was held in captivity for 552 days. *Id.* at 14-16. ISIS reported her death on February 6, 2015. *Id.* at 16. The Estate of Kayla Mueller seeks damages for pain and suffering that Kayla endured while a prisoner of ISIS. The circumstances of Kayla Mueller's kidnapping and captivity are outlined to an extent in the deposition testimony of the family member Plaintiffs, but the primary source of the facts relevant to my Report are set forth in the report of Dr. Gartenstein-Ross, addressed below.

**Report of Dr. Gartenstein-Ross**.  The Court's Liability Opinion 1 cited and found credible the expert report submitted by Dr. Gartenstein-Ross.[2]  *See* Expert Witness Report of Dr. Daveed Gartenstein-Ross, February 17, 2020, ECF No. 28-1 ("Report of Dr. Gartenstein-Ross"). The Court further found reliable and relevant Dr. Gartenstein-Ross's testimony in the related Sotloff case.  Liability Opinion 1 at 4.  In addition to providing an analysis of the rise of ISIS and its actions as relevant to a determination of liability, Dr. Gartenstein-Ross provides detailed information about ISIS's treatment of its prisoners in general and Kayla Mueller in particular.  The Report of Dr. Gartenstein-Ross details the typical treatment of prisoners of ISIS and provides evidence of the pain and suffering of Kayla Mueller during her captivity.  *See* Report of Dr.

---

[2] Dr. Gartenstein-Ross is an expert on the evolution of ISIS.  Liability Op.1 at 2-3.  He holds a Ph.D. and M.A. in World Politics from Catholic University of America, a J.D., *magna cum laude*, from New York University School of Law, and a B.A. with Honors, *magna cum laude*, from Wake Forest University.  Gartenstein-Ross Report at 4.  He is the Chief Executive Officer of Valens Global, a private commercial firm focused on understanding and fashioning responses to VNSAs – Violent Non-State Actors.  *Id.* at 3.  He also holds appointments at think tanks in the United States and Europe.  *Id.* He is a Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies (FDD), a nonpartisan policy institute in Washington, D.C.  He is an Associate Fellow at the International Centre for Counter-Terrorism – The Hague (ICCT). *Id.* at 3-4.  He authored several studies for ICCT, some of which required international field research.  *Id.* at 4.  He also served as a Fellow at Google's think tank Jigsaw, for which he worked on several major projects responding to violent extremists' use of online platforms.  *Id.* He worked on these issues for the U.S. government, including serving as a Senior Advisor to the Director of the U.S. Department for Homeland Security's Office for Community Partnerships (2016-17).  *Id.* Dr. Gartenstein-Ross has been accepted as an expert by this Court and by other courts in this Circuit and, accordingly, I may consider his report in evaluating compensatory damages.  *See Sotloff I*, 525 F. Supp. 3d at 133; *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 n.4 (D.D.C. 2017) (accepting Dr. Gartenstein-Ross as an expert witness); *United States v. Young*, 916 F.3d 368 at 381 (4th Cir. 2019) ("[T]he district court did not abuse its discretion in admitting Dr. Gartenstein-Ross' testimony" on, inter alia, violent extremist movements claiming inspiration from Islam); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 n.2 (D.D.C. 2018) (accepting Dr. Gartenstein-Ross as an expert on, *inter alia*, violent non-state actors, including identifying and analyzing online content generated by violent non-state actors and Iran's use of proxy organizations in Iraq from the 1990s to 2012).

Gartenstein-Ross at 26-37. Dr. Gartenstein-Ross's statements about Kayla Mueller's treatment are based on his own knowledge of ISIS's methods, evidence from other prisoners who have been released and were held by ISIS during the same time period, contemporaneous news reports, and data gathered in studies of ISIS prisons.[3]

Dr. Gartenstein-Ross states that torture is standard operating procedure for ISIS and that torture commences immediately when a victim is kidnapped. *Id*. at 26; Liability Opinion 1 at 13. ISIS employs multiple methods of physical torture including severe beatings – sometimes while prisoners are suspended in the air. *Id*. ISIS uses various torture devices into which they insert prisoners to cause maximum pain and potentially permanent spinal injuries. *Id.* at 29. Dr. Gartenstein-Ross described the constant psychological torture to which prisoners of ISIS were subjected. *Id.* at 27-28. Prisoners were placed in solitary confinement and threatened with death and torture. Liability Opinion at 13; Report of Dr. Gartenstein-Ross at 28. In fact, ISIS placed severed heads of prisoners in the cells with living prisoners. *Id.* at 28. They were forced to watch the execution and torture of other prisoners and they were subjected to mock executions. *Id.* at 37.

Female prisoners received even more heinous treatment. They were subjected to all the forms of physical and psychological torture noted above but in addition the treatment of female prisoners included sexual torture and rape. *Id.* at 30. Dr. Gartenstein-Ross explains that this treatment of women is sanctioned by the ISIS interpretation of religious text. *Id.* In fact, ISIS

---

[3] Dr. Gartenstein-Ross notes that his conclusions about the types of physical and psychological torture employed by ISIS are informed by data compiled in 2017 by the International Center for the Study of Violent Extremism (ICSVE) *The ISIS Prison System: Its Structure, Departmental Affiliations, Processes, Conditions, and Practices of Psychological and Physical Torture*. Report of Dr. Gartenstein-Ross at 27.

writings glorify and sanctify the enslavement of female prisoners. *See id.* at 30-36. Dr. Gartenstein-Ross states that:

> Many, if not most, female hostages, and especially non-Muslim females [*sic*] captives, were sexually tortured and abused. ISIS enslaved these female prisoners as sex slaves, or *sabaya*. ISIS also frequently coerced female hostages into converting to the Islamic faith, and forced them into "marriages" with ISIS operatives.

*Id.* at 30.

The Report of Dr. Gartenstein-Ross provides significant information about the circumstances of Kayla Mueller's captivity and her treatment as a hostage. Dr. Gartenstein-Ross states that Kayla Mueller was moved several times during her captivity and held in various different locations. Based on available evidence, she was initially placed in solitary confinement and remained there for about 5 months. *Id*. at 37-38. Other hostages that were held captive during the same time period report that Kayla Mueller was held in various detention centers as an accused spy and that she was abused. *Id*. at 37. She was then moved to a location where other foreign prisoners, including Mr. Sotloff, were being held. *Id.* During this time she was held in small, dark rooms and was subjected to verbal and psychological abuse. *Id*. at 39. She was later moved to a prison in Raqqa. *Id*. Witnesses report that the prisoners at that location were held in small, dark rooms with no power and that the prisoners were starving. *Id.* at 39-40. She was then moved to the home of a deputy of Abu Bakr al-Baghdadi (described by Dr. Gartenstein-Ross as a key leader) located in a suburb of Raqqa. *Id*. at 40. Dr. Gartenstein-Ross states that the evidence of the abuse and rape of Kayla Mueller by Al-Baghdadi is "overwhelming." *Id*. at 41. The Report of Dr. Gartenstein-Ross includes a description of abuse of Kayla Mueller that is set forth in an FBI criminal complaint. That complaint, filed against Umm Sayyaf – the wife of an ISIS minister Abu Sayyaf – contains a recitation of the following testimony of Umm Sayyaf:

The captives were at various times handcuffed, held in locked rooms, and given orders on a daily basis with respect to their activities, movements, and liberty.… The defendant chastised the captives by calling them "kafir" or "infidels." During their captivity, the defendant and other co-conspirators showed violent ISIL propaganda videos to Ms. Mueller,.… the defendant threatened Ms. Mueller, telling them that she would kill them if they did not listen to her.

*Id.* at 40.

Ms. Mueller and the other young women had no freedom and were compelled to serve at the behest of the ISIL men. The young women were characterized as being "owned" by the ISIL men who acquired them. While in captivity, Kayla Jean Mueller was sexually abused by Baghdadi, who forced her to have sex with him. The defendant knew how Ms. Mueller was treated by Baghdadi when Ms. Mueller was held against her will in the defendant's home.… The defendant admitted that ISIL members, including Abu Bakr al-Baghdadi, would stay at her residence on an as-needed basis. The defendant admitted that Abu Bakr al-Baghdadi "owned" Ms. Mueller during the period of time that Ms. Mueller was in captivity at the Sayyaf residence. The defendant admitted that "owning" is equivalent to slavery.[4]

*Id*. at 41.

Dr. Gartenstein-Ross also cites an ABC news report confirming that Kayla Mueller was beaten while living in the Sayyaf home. *Id.* at 43. Dr. Gartenstein-Ross concludes that the evidence from witnesses and open reports show that Kayla Mueller was "owned" by al-Bagdadi and that she was subjected to slavery, sexual torture, rape, and that she was forced to convert to Islam. *Id*. at 42. Dr. Gartenstein-Ross opines that Kayla Mueller was tortured throughout her captivity and that ISIS in fact murdered her (notwithstanding the ISIS statement that Kayla Mueller was killed in an air strike). *Id*. at 24.

**Psychological Autopsy Report of Chitra Raghavan.** Plaintiffs submitted the Report of Chitra Raghavan to demonstrate the psychological damage to Kayla Mueller resulting from her treatment while imprisoned before her death. *See* Expert Report of Dr. Chitra Raghavan,

---

[4] The "defendant" referred to in the language quoted from the criminal complaint is Umm Sayyaf. *See* Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Bahar,* 1:16-mj-63 (E.D. Va.), Document 4, Page ID 4.

Psychological Autopsy, November 1, 2022, attached hereto as Exhibit 1, ("Raghavan Report"). Dr. Raghavan is a licensed clinical psychologist with more than 15 years' experience in the field of clinical psychology. *Id*. at 3-5. Dr. Raghavan is a full Professor of Psychology and Director of Forensic Mental Health Counseling Program and Coordinator of Victimology Studies in Forensic Psychology at John Jay College of Criminal Justice. *Id.* at 3-4. She received a doctorate in Clinical and Community Psychology at the University of Illinois, Urbana-Champaign and had post doctor training at Yale University. *Id.* at 4. Dr. Raghavan has testified as an expert witness in criminal cases involving domestic violence, sexual assault, and sex trafficking. *Id*. Notably, Dr. Raghavan testified in a case holding that theories of trauma bonding and coercive control are well established in the psychological and legal communities and has testified in other cases as a witness for the prosecution regarding the effects of traumatic abuse and coercive control. *Id.* Dr. Raghavan has made over 150 conference presentations and published over 40 articles in journals such as Violence Against Women, American Journal of Community Psychology, Journal of Traumatic Stress, and Journal of Interpersonal Violence. In addition, she has edited two books: (i) Self-Determination and Women's Rights in the Muslim World (Raghavan, C. & Levine, J., eds.), HBI Series on Gender, Culture Religion, and Law (Boston: Brandeis University Press 2012); and (ii) Domestic Violence: Methodologies in Dialogue (Raghavan C. & Cohen, S.J., eds.), Northeastern Series on Gender, Crime, and Law (Northeastern University Press 2013). *Id*. at 5. *See also* Chitra Raghavan, Professor of Psychology, Director of The Forensic Mental Health Counseling Program, Coordinator of Victimology Studies in Forensic Psychology, John Jay College of Criminal Justice, https://jjay.cuny.edu/faculty/chitra-raghavan. Dr. Raghavan states that she prepared her Report and analysis of the psychological torture of and damage to Kayla Mueller during her captivity based on her "training, teaching and clinical experience with hundreds of survivors of gender-

based violence … as well as scientific knowledge of the outcomes of abduction, sexual assault, rape, and torture."  Raghavan Report at 1.  Dr. Raghavan also reviewed the documents filed in this case, the report of Dr. Gartenstein-Ross, and numerous articles.  *Id.* at 1-2.   In addition, she interviewed Kayla Mueller's family.  *Id.*

Based on her credentials, and her experience as an expert witness, I conclude that Dr. Chitra Raghavan qualifies as an expert who can opine about the psychological effects of Kayla Mueller's imprisonment, abuse, and torture.

The Raghavan Report delineates the forms of psychological torture to which Kayla Mueller was subjected based on Dr. Raghavan's analysis of the available records and evidence. Specifically, the Raghavan Report states that Kayla Mueller experienced coercive control.  The Raghavan Report defines "coercive control" as follows:

> Coercive control is an abuse dynamic that seek to strip the victim of autonomy and agency by using a series of interlinked tactics such as degradation, intimidation, microregulation, isolation, and manipulation, including intermittent rewards (or absence of abuse) and punishment. This framework argues that physical abuse— while frightening—is not central or necessary for abuse to be injurious or effective and tactics such as isolation, degradation, and sexual assault are more powerful ways to systematically destroy the victim's well-being. Coercive control is designed to induce deep suffering in the victim and keep the victim in constant fear and anxiety. Using these interlocking tactics the victims not only lose their agency and are forced into compliance, but also develop or experience a worsening of traumatic symptoms.

*Id.* at 7. Dr. Raghavan further found that Kayla Mueller experienced degradation, forced marriage and conversion, retaliation and punishment, life threatening violence, sexual assault, physical abuse, isolation, micro regulation and trauma*. Id.* at 7-10.  Dr. Raghavan opines that "It would be difficult to find a circumstance more dangerous, poisonous, or harmful than the one in which Kayla was held captive."  *Id.* at 2.  Dr. Raghavan further finds that "Kayla's degradation was physical, sexual, and spiritual.  She was confined alone for long periods of time, subsequently

repeatedly raped and then forced to marry her rapist. She was forced to convert to Islam and ordered to study daily following sexual assaults by Al-Baghdadi. This abuse was a direct attack on Kayla's dignity. Her conversion and marriage would have required her to "accept" Islam and claim that she was freely consenting. Forced to participate in ones own denigration is the final step before the victim surrenders in total psychological defeat." *Id.* at 3.

Dr. Raghavan observes that Kayla would have been subjected to retaliatory beatings and abuse after the escape of other prisoners. *Id.* at 8. Dr. Raghavan notes that women who were held with Kayla reported that Kayla would return to her cell weeping following the rapes. *Id*. at 9. Dr. Raghavan states that "[o]f different traumas, sexual violence has consistently been linked to the greatest triggers of psychological harm. Sexual assault is experienced as more intrusive than other physical attacks …." *Id.* at 11. Dr. Raghavan also notes that because "Kayla was likely sexually assaulted repeatedly up till her death" … she "likely experienced emotional suffering throughout this period." *Id.* Dr. Raghavan opines that based on reports from other hostages, Kayla Mueller was terrified during her captivity and that she cried for long periods after the assaults. *Id.* at 15,16. Dr. Raghavan explains that fear and terror are "paralyzing emotions." *Id.*

Dr. Raghavan concludes that:

Kayla Jean Mueller was degraded, tortured, raped, and eventually executed. Kayla was a woman of faith and this strength would have given her precious moments of peace. But years of research examining torture and sexual assault all point to the same outcome – Kayla would have lived in fear and despair, and an ever-consuming pain as her body and spirit were violated. While we do not know the details, few days prior to her execution her captors would probably have escalated their dehumanization – as documented frequently in other genocides (i.e., what the Nazis did to the captive Jewish prisoners before killing them) which would allow them to vent their rage and kill her with the maximum amount of please in the deed. The kind of atrocities perpetrated on this young woman have little equivalent in words. To say that Kayla suffered horribly is ultimately an understatement.

*Id*. at 16. Dr. Raghavan further concludes in her summary of her Report:

> It is my professional opinion with a reasonable degree of psychological certainty that these horrific experiences from which Kayla had no escape would have slowly destroyed her sense of self, eroded her young spirit, and dimmed her optimism. Her last few moments would have been a tortured see saw of emotions – last minute despairing hope that the U.S. would somehow intervene and free her, images and memories of the sweetest moments of her earlier life, and freedom, interspersed with the horrific reality that her captor's contemptuous treatment of her signaled her own impending violent death.

*Id*. at 3.

## B.    INDIRECT VICTIM PLAINTIFF MARSHA JEAN MUELLER.

Marsha Jean Mueller provided deposition testimony in support of her claim. *See* Deposition Transcript of Marsha Jean Mueller, attached hereto as Exhibit 2. Marsha Mueller is a United States citizen and is the mother of Kayla Mueller.  *Id*. at 5:14-15; 6:10-11.  In her testimony, Marsha Mueller provided details about Kayla Mueller's childhood, noting that Kayla had always worked to help others, even when she was still in school.  *Id*. at 6:12-7:12. She described Kayla's belief in God – and recited one of Kayla's statements:  "the only one you truly have is God".  *Id*. at 10:16. She testified that Kayla worked hard to finish college in 2 and a half years so that she could go out into the world and get more real-life experience.  *Id*. at 12:13-20.  Kayla took on several different jobs and projects in various countries (including India, Israel (helping African refugees), and the Palestinian territory).  *Id*. at 15:12-16:19. When she was in the United States, she volunteered at an HIV/AIDs clinic.  *Id*. at 17:20-21.  She took a position as an au pair in France to learn French so that she could work in a French speaking area of Africa for the Peace Corps.  *Id*. at 14:15-19. After war broke out in Syria, Kayla went to work for a Turkish NGO that was helping Syrian families.  *Id*. at 21:8-21.

On August 5, 2013, Marsha Mueller received a call advising that Kayla had been detained in Syria.  *Id*. at 23:16-21.  She did not know initially that Kayla had been kidnapped by ISIS but learned of this when a friend of Kayla's was released.  *Id*. at 26:18-27:4. Marsha Mueller details

their constant (fruitless) efforts to find ways to get Kayla released and to obtain information about Kayla's whereabout and well-being.  *Id*. at 27-47.  She traveled overseas with her husband in an effort to find Kayla.  *Id*. at 44:11-45:2. She traveled to Washington DC and met with representatives of the administration to try to get support for Kayla's release.  *Id*. at 32:8-11.  She testified that she felt that the United States government was not helpful and, in the end, she concluded that the government was not actually trying to free Kayla. *Id*. at 40:5-13; 45:23-46:17.  She described the emotional effects of waiting to hear about her daughter, the optimism she felt when some hostages were released, and the horror of being told her daughter had been killed.  *Id*. at 29:20; 42:2-6; 51:12-21.  She did not learn that Kayla was being held by al-Baghdadi until after Kayla's death. *Id*. at 39:2-9. At that time, she learned of the conditions under which Kayla was held. She wakes up every night thinking about Kayla and the fact that she was raped.  *Id.* at 48:1-4.  She wonders whether Kayla became pregnant or had a child.  *Id.*  She worries about Kayla's brother Eric.  *Id.* 49:17.  Kayla's death has affected the entire family:  Marsha Mueller says that a piece of the family is missing.  *Id*. at 55:7-8.

## C.    INDIRECT VICTIM RICHARD CARL MUELLER.

Richard Carl Mueller provided deposition testimony in support of his claim.  *See* Deposition Transcript of Richard Carl Mueller, attached hereto as Exhibit 3.  He is the father of Kayla Mueller and is a United States Citizen.  *Id*. at 5:18-23.  He generally goes by the name "Carl."  *Id*. at 5:15-16.  In his testimony, he notes the importance of faith in their lives as Kayla was growing up.  *Id*. at 7:6-12.  He described Kayla's passion for service and for helping others when she was in high school.  *Id*. at 7-8.  He testified that Kayla wanted to go to Africa and work with AIDS patients, but she had to become proficient in French before she could do so.  *Id.* at 8:19-25.  After spending a year in France, Kayla met a Syrian man who told her about the plight of the

Syrian people.  *Id*. at 9:15-17.  He states that Kayla was overwhelmed by the issues facing the Syrian people.  *Id*. at 12:8-9.  He took her to the airport when she traveled to Turkey to work with the Syrian refugees.  It was the last time he saw her.  *Id*. at 12:11-18.

He first learned that something was wrong when he received a call one early morning advising him that Kayla had not returned to work after traveling into Syria.  *Id*. at 12:19-13:3. He was devastated.  *Id*. at 13:6. He learned that Kayla had been taken by ISIS – but did not know what ISIS was at the time. *Id.* at 14:5-9.  He reached out to the State Department but did not get a response.  *Id.* at 14:20-24.  He then contacted a state senator that he knew and that led to a call from Senator McCain.  *Id*.at 15:1-23.  He felt at that time that they would receive help from the government.  He testified about the tremendous stress that he and his wife experienced during Kayla's captivity.  *Id*. at 16-17.  They were told not to pay the ransom demanded by ISIS and that in fact they would be prosecuted if they paid.  *Id*. at 20:5-11.  They learned of the conditions in which Kayla was held and of her treatment through private individuals and hostages who had been released.  *Id*. at 20:20-21:1. They went to Qatar to try to negotiate for Kayla's release.  *Id.* at 21:4-7.  Carl Mueller testified that the U.S. government told the officials in Qatar that they would not pay ransom.  *Id*. at 21:15-22:5. He explained his feelings when a report on torture at Guantanamo Bay was released:  he knew that it would affect Kayla and the other hostages.  *Id*. at 24:15-24.  He described learning that Kayla had been held as a sex slave.  *Id.* at 26:18. He doesn't know how they survived it.  *Id*. at 26:20-21.  He believes that this ordeal took 10 years off their lives.  *Id*. at 26:23-24.  They think about Kayla every day.  *Id*. at 24:25-25:1. It continues to affect their sleep. *Id*. at 26:24.  Eric, Kayla's brother, has probably had the roughest time.  *Id*. at 27:6.  Eric tried to convince Kayla not to go and they had an argument.  *Id*. at 27:12-14.  Eric gets extremely emotional and upset and has been to psychologists to address his anxiety and stress.  *Id*. at 28:2-4.  He recalls

that they were first told that Kayla had been killed in a bombing raid in an email from ISIS.  *Id.* at 29:12-13.  They contacted the FBI and demanded proof.  *Id*. at 29:17-20.  They received photos that showed only Kayla's face. *Id*. at 29:22-24.  He is very angry with the government. *Id*. at 30:11-17.  For a long time they did not believe Kayla was dead but based on information from multiple sources, they now believe it is true.  *Id*.at 33:4-34:13.  He struggles with his faith now.  *Id*. at 36:19-22.  He remains extremely proud of Kayla.  *Id*. at 37:8-14.

## D.    INDIRECT VICTIM ERIC MUELLER.

Eric Mueller is Kayla Mueller's older brother.  He is a United States Citizen.  *See* Deposition Transcript of Eric Mueller, attached hereto as Exhibit 4, at 5:13-19.  Eric Mueller testified that he and Kayla were very close growing up and that they "did everything together."  *Id.* at 6:7.  He has fond memories of traveling on road trips with Kayla and his parents where he and Kayla would play games.  *Id*. at 7:12-17.  He testified that Kayla was always worried about other people and tried to make sure everyone played together nicely.  *Id*. at 8:4-8.  In middle school, she continued to take others who did not have many friends under her wing to make sure that they were not alone.  *Id*. at 9:5-13.  She got involved in community projects when she was in middle school.  *Id*. at 9:14-17.  Eric moved about 15 minutes away when he was 18 – and he and Kayla continued to spend significant time together.  *Id*. at 10:8-15.  Eric's wife was like a sister to Kayla. *Id*.  at 11:4-5.  Eric's daughter met Kayla a few times when she was young – and she and Kayla communicated when Kayla was overseas.  *Id*. at 12:2-15.

He was at work when his parents came to tell him that Kayla had been in Syria and taken hostage.  *Id*. at 15:14.  At that time, they did not know who had taken her or where she was.  *Id*. at 16:16-18.  They did not know at that time whether Kayla was alive.  *Id*. at 16:23.  He had to continue to work as if nothing was wrong – while they waited for news.  When they received

ransom demands he at first thought it was a hopeful sign but as time went on, he was less hopeful. *Id*. at 19-20. Kayla's abduction and murder affected the family in many ways. *Id*. at 20:25. The family grew distant and he experienced anger issues and outbursts. *Id*. at 21:16. It took a big toll on his family relationships. *Id*. at 21:23. He was not sleeping and had nightmares about Kayla. *Id*. at 22:9-10. He is still working on these issues and it is a "daily struggle." *Id*. at 22:16. He was treated for depression about a year and a half after Kayla's death. *Id*. at 22:21-23. He went through several antidepressants and felt he was a shell of a person. *Id*. at 23:4-5. He took Xanax several times a week for panic attacks. *Id*. at 23:12-19. He started to have heart issues – where his resting heart rate would go to 140 beats per minute. *Id.* at 24:17-19. A new doctor sent him to a counselor who specializes in PTSD and traumatic family loss. *Id*. at 25:18-22. He still has nightmares but believes that being able to talk to people about the trauma has helped. *Id*. at 27:1-6. He described the nightmares as dreams about the things that were done to Kayla. *Id*. at 28:18-29:4. He feared for his family – thinking that ISIS might come after them because ISIS published the full name and addresses of his parents. *Id*. at 31:4-12. He describes his feelings during the period of time when Kayla was held hostage as utter helplessness. *Id*. at 34:12-15. As the older brother, he felt he should protect his little sister – but there was nothing he could do. *Id*. at 33:8-34:20. He is proud of what Kayla accomplished in her short life. *Id*. at 36:10.

## ANALYSIS OF COMPENSATORY DAMAGES

### A.     ECONOMIC LOSS ANALYSIS – ESTATE OF KAYLA MUELLER

The Estate of Kayla Mueller has submitted an expert report prepared by Chad Staller, President and Senior Economist at The Center for Forensic Economic Studies ("CFES"). *See* Expert Report of Chad Staller, May 21, 2021, attached hereto as Exhibit 5 ("Staller Report"). Mr. Staller is a "Certified Valuation Analyst." *Id.* at 210. Mr. Staller has a Master's of Business

Administration and a Juris Doctor from Temple University. *Id.* He is on the faculty of the Temple University trial advocacy LLM program. He has calculated economic loss in multiple personal injury cases and has testified by deposition or in trial in numerous cases in multiple different courts. He has been accepted as an expert in other FSIA cases. *See, e.g., Sotloff I*, 525 F. Supp. 3d 121; *Coombs v. Islamic Republic of Iran*, No. 19-CV-03363 (RDM), 2023 WL 4894939 (D.D.C. July 5, 2023); *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328 (D.D.C. Mar. 31, 2022); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021); *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019); *Lelchook v. Syrian Arab Republic*, No. CV 16-1550 (RC), 2019 WL 4673849 (D.D.C. Sept. 25, 2019); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) (*Fritz I*); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015). Based on his experience and credentials, I believe that Mr. Staller qualifies as an expert in the area of economic loss computations.

The economic loss computation for the Estate of Kayla Mueller is based on the complaint in this case, biographical information about Kayla Mueller, and publicly available governmental and professional data and publications. Staller Report at 1. Kayla Mueller was employed as an aid worked by Support for Life in Turkey. *Id.* She had previously worked for various other organizations as an aid worker. *Id.* She had a bachelor's degree from Northern Arizona University and was 26.5 years old at the time of her death. *Id.*

The computation of economic loss is based on a well-accepted methodology and applies credible and reliable data. The computation starts with a projected annual salary for Kayla Mueller following her work as an aid worker. The expert assumes that Kayla Mueller would have continued her aid work through the end of 2014 – and that the compensation for such work would

be fully consumed by her own personal maintenance needs – resulting in no economic loss in 2014. *Id.* The expert then projected that in 2015, Kayla Mueller would have obtained employment at a compensation level consistent with that of a person graduating that year with a bachelor's degree. *Id.* at 2. This assumption yields a starting salary of $48,211 based on U.S. Census data adjusted to account for "current dollars" as of the date of the expert report (2021). *Id.* at 7. The expert then adds a factor to account for benefits: the expert calculates benefits as 5% of earnings – based on data from the U.S. Department of Labor, Bureau of Labor Statistics. *Id.* at 3 f.n. 14. The expert calculation assumes, conservatively, that Kayla Mueller's compensation would continue to lag behind that of her "age cohort" throughout her work life. *Id.* at 2. To compute lost earnings, the expert determines the salary and benefits each year after applying a growth rate to the starting salary and benefits. *Id.* at 3. The computation applies a modest earnings growth rate of 2.87% per year based on the annual change in wages for hourly workers in the non-farm economy from 2000 to 2020 – again using Bureau of Labor Statistics data. *Id.* The computation continues this yearly calculation through two different work life estimates: statistical work life of 36.7 years and continuous work life until social security retirement age of 40.5 years. *Id.* at 2. Both assumptions are reasonable and based on standard data sources. Once the wage loss is thus computed for each year using both work life estimates, the expert deducts amounts attributable to taxes and to personal maintenance or consumption. The deduction for taxes includes both state and federal taxes and are based on the assumption that Kayla Mueller would file as a single individual. *Id.* at 3. The deduction for personal maintenance is based on the Consumer Expenditure Survey[5] and results in a deduction of between 56% and 72.6% from the calculated wages. *Id.* at 3 f.n. 13. These

---

[5] Consumer Expenditure Survey, U.S. Department of Labor, Bureau of Labor Statistics, https://www.bls.gov/cex/.

percentage deductions assume, again, that Kayla Mueller would remain a single individual.  *Id.* at 3.  After computing the total aggregate amount of loss using the above assumptions, the expert reduces the total to a present value amount.  *Id.* at 4.  The calculation of present value applies an interest rate of 1.97% on the principal amount (based on the yield on high grade municipal bonds in between May 2020 and April 2021) and applies a higher interest rate of 4.04 % on the reinvested interest.  *Id.* The 4.04 % rate is based on the bond yield from 2001 to 2020.  *Id.* The above methodology yields combined past and future economic loss between $981,788 and $1,125,200 expressed in present value terms as of the date of the expert report (May 21, 2021).  *Id.* at 5.

As noted, the methodology employed is consistent with generally accepted procedures for determining lost future wages and the data applied to conduct the computations are all derived from reliable and appropriate sources.  In my view, as noted above, the computation may be viewed as conservative.  The computation does not account for more significant wage growth that can occur and does not account for the value of Kayla Mueller's extensive experience in international issues and language proficiency – both of which could reasonably be viewed as factors that would have enabled Kayla Mueller to obtain a higher level of employment compensation.  Additionally, the calculation does not provide an alternative analysis assuming that Kayla Mueller would have married at some point (which is a reasonable assumption that could be applied).  I conclude that the economic loss computations are reasonable and well supported and recommend accepting the highest amount computed - $1,125,200 - in determining compensatory damages.  This aggregate loss is composed of $75,533 in past loss (*i.e.*, loss between 2013 (the date of capture) and 2021 (the date of the expert report)) and $1,049,667 in future loss (*i.e.*, loss after 2021).

**B.      NON-ECONOMIC PAIN AND SUFFERING DAMAGES – ESTATE OF KAYLA MUELLER**

The estate of Kayla Mueller seeks compensatory damages for both the period of captivity and for the pain and suffering endured while captive.  In evaluating the recommended amount of "pain and suffering" damages for the estate of a Direct Victim who was kidnapped, held hostage, and murdered, I must take into consideration and be guided by prior decisions in this district awarding damages to victims of terrorism.  The analysis must recognize the basic principle that such damage awards should be generally consistent to the extent the circumstances can appropriately be characterized as similar.  *See e.g., Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014).

The claims for pain and suffering damages in this case can be divided into three components:  the damage associated with captivity itself; the damage associated with the torture and abuse suffered during captivity; and pain and suffering experienced at the time of death – based on available information.

The analysis begins with the basic guideposts outlined in the body of case law in this circuit:  If there is evidence of conscious pain and suffering before death, then pain and suffering damages may be awarded to a victim killed by the terrorists.  The amount of damages is determined based on the evidence and takes into consideration factors including the duration of the pain and suffering, the nature and extent of the injuries both physical and psychological, the fear and terror experienced by the victim, and the circumstances surrounding the death.

Pain and suffering damages are not limited to physical pain, but also take into account mental anguish based on the conscious knowledge of imminent death and courts have consistently recognized that the fear and distress a decedent experienced knowing that death is imminent in the context of a terrorist act is a reasonable component of damages.  *See Baker v. Socialist People's*

*Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (Victim was "entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone"); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266-73 (D.D.C. 2008) ($18 million in pain and suffering damages to victims who survived just a few minutes after a plane bombing).

In determining damages where a victim has been held captive for a significant period of time, courts in some cases have awarded amounts based on the number of days in captivity. *See, e.g., Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118 (D.D.C. 2019) (Courts typically apply "a per-diem formula—awarding $10,000 per day of captivity—to compensate for injuries sustained while imprisoned.").[6]

---

[6] *See, also, e.g.*, *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 6 (D.D.C. 2019) ($1,920,000 for hostage held on 192 days); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163-64 (D.D.C 2017) (awarding $16.02 million in pain and suffering damages for plaintiff's 1,602 days of imprisonment); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) ($1.68 million for 168 days); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135–36 (D.D.C. 2005)  ($1.05 million for 105 days of captivity); *Kilburn*, 699 F. Supp. 2d at 153 (D.D.C. 2010) ($5.03 million for 503 days); *Massie v. Government of the Democratic People's Republic of Korea* 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) ($3,350,000 for 335 days); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 100 (D.D.C. 2003), *abrogated by Cicippio, Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004)) ($650,000 for 65 days); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d. 27, 37 (D.D.C. 2001) ($5,640,000 for 564 days); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51(D.D.C. 2001) ($23 million for 2,354 days); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 26 (D.D.C. 2001) (awarding $2,050,000 for victim held 205 days; $1,260,000 for 126 days; and $50,000 for 5 days); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) ($24,540,000 for 2,454 days); *Frost v. Islamic Republic of Iran*, Case No. 17-cv-603 (TJK), 2019 WL 5110604, at *24 (D.D.C. August 26, 2019), *report and recommendation adopted in part and rejected in part on other grounds*, 419 F. Supp. 3d 112 (D.D.C 2020)(awarding $310,000 for 310-day period of captivity); *Azadeh v. Islamic Republic of Iran*, No. 16-1467 (KBJ), 2018 WL 4232913, at *18

In other cases, courts have instead awarded compensation based on the nature of the conditions under which the victim was held captive – taking into account abuse, torture, and the severity of injuries inflicted. While all cases of torture, abuse, and murder perpetrated by terrorists are intentionally barbarous, there are some cases – such as this one – that present extreme circumstances. Courts have awarded substantial pain and suffering damages to victims who were held captive and subjected to particularly brutal torture before death, or particularly painful and savage treatment, or where the killing was performed in a manner that assured egregious suffering. *See, e.g.*, *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 346 (D.D.C. 2016) (awarding a lump sum of $25,000,000 to each former hostage, in addition to a *per diem* amount of $19,670,000 for each day of their captivity, based on their "extreme suffering" which included a plane crash, being subjected to long marches, weighed down by chains, denied medical treatment, starved, and exposed to and forced to suffer from serious illnesses coupled with constant fear of death – for total pain and suffering awards of $44,670,000 for each surviving victim); *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (awarding $30 million to the estate of victim who was held captive for a short period of time – three days – but was subjected to blunt force trauma, strangulation and bodily mutilation before death, including the removal of his eyes and tongue); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 185 (D.D.C. 2003) (award of $35 million to Col. Acree and $30 million to Lt. Col. Fox, captured and held captive in Iraq for 47 and 15 days, respectively, during which they were brutally beaten, starved, and subjected to inhumane treatment); *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C.

---

(D.D.C. Sept. 5, 2018) ($1,140,000 for 114 days of captivity); *Fritz v. Islamic Republic of Iran*, No. CV 15-456 (RDM), 2018 WL 5046229, at *23 (D.D.C. Aug. 13, 2018) ($10,740,000 for 1,074 days held in captivity).

2018) ($15 million in compensatory damages for pain and suffering where deceased was detained for over 17 months; returned in a vegetative state, was subjected to a publicized coerced "confession" and trial, and severe torture); *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53 (D.D.C. 2008) ($50 million awarded for each victim held captive and then beheaded with a knife).

These cases provide important and pertinent guidance in evaluating pain and suffering damages for the for Victims who experience severe torture and extended periods of captivity.  In this case, the Direct Victim experienced a long period of captivity, nearly 18 months, during which she was subjected to inhumane and brutal treatment – both physically and psychologically.  For this reason, I believe that the reasoning of the cases cited above provides an appropriate framework for determining pain and suffering damages and that the per diem formula adopted by courts in some cases would not be appropriate.  The per diem formula would yield an award of $5.52 million – an amount that does not fairly account for the extreme nature of the circumstances and the abuse and torture inflicted upon Kayla Mueller.  *See, e.g.*, *W.A. v. Islamic Republic of Iran*, No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020), *report and recommendation adopted*, No. CV 18-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020) (awarding $10,000,000 to the estate of a man who suffered severe physical and psychological torture over 5 days, had holes drilled into his body, was burned, and had bruising and broken bones from beatings, was used to extort money from his family and was then murdered, concluding that the *per diem* amount of $50,000 would be a "perverse application" of the formula).

In our system of justice, we are charged with the obligation to place a monetary value on the suffering of victims and in this context we do so by considering precedent.  To assess an appropriate pain and suffering award in the case of Kayla Mueller, I find most instructive and relevant the analysis and determination of damages in the case involving two individual American

victims who were kidnapped and held captive and tortured by ISIS during the same time period

and in the same locations as Kayla Mueller and who were thereafter executed by ISIS – specifically

the cases of James Foley and Stephen Sotloff. *See Sotloff v. Syrian Arab Republic*, No. CV 16-

725 (TJK), 2023 WL 2727599, at *2 (awarding $56.5 million (plus prejudgment interest) to the

estate of James Foley for pain and suffering, and $54 million (plus prejudgment interest) to the

estate of Stephen Sotloff for pain and suffering) ("*Sotloff II*").  All three of these victims were held

by ISIS under similar conditions.  Report of Dr. Gartenstein-Ross at 26.  Each of these victims was

held captive for a lengthy period of time – in excess of 1 year.  The available evidence shows that

each of these victims was subjected to similar methods of torture.  *Id.* at 26-30.

There are some differences of course.  In the Foley and Sotloff cases, the manner of death

and the evidence regarding the pain and fear associated with their brutal executions was a

significant factor in the pain and suffering award.  We do not have the same type of information

about the manner of Kayla Mueller's death.  This does not mean that Kayla Mueller experienced

less pain and suffering or that the manner of death was less terrifying.  The proof of death photos

do not reveal the exact cause of death but the injuries shown on her face suggest that she suffered

a violent death and the expert evidence provides a basis to conclude that she experienced

significant fear, terror, and pain leading up to her death.

The uncontroverted evidence demonstrates that Kayla Mueller suffered from prolonged

mental abuse, torture, and sexual violence over nearly a year and half of captivity.  The

psychological torture employed by ISIS is intended and designed to foster fear of death and Kayla

Mueller would have experienced a constant fear of death throughout her captivity.  The evidence

in both expert reports show that she was terrified – to the point of refusing to join an escape effort

mounted by other hostages.  *See* Report of Dr. Gartenstein-Ross at 43.

Based on the uncontroverted evidence, it is reasonable to conclude that Kayla Mueller was subjected to more extreme abuse than male American prisoners *because* she was a woman. During her captivity, Kayla Mueller was held as a sex slave and experienced savage and brutal treatment at the hands of her "owner." While all forms of torture and abuse are heinous, the sexual torture visited on this 24-year-old – whose only desire was to help people who were suffering – is particularly barbaric. This is, like the Sotloff and Foley cases, an extraordinary case that warrants an extraordinary pain and suffering award.

The complaint filed in this case sets forth a prayer for relief on multiple counts that total, in the aggregate, $80 million for the co-representatives of the Estate of Kayla Mueller. *See* Complaint, ECF No. 1, ¶¶ 50, 53 ,56, 59. In a damages memorandum submitted to the undersigned, the Plaintiffs propose a damages award for the Estate of Kayla Mueller of $60 million for pain and suffering with an additional amount of $5.52 million to account for the duration of captivity – for a total award of $65.52 million. This proposal is similar to the structure of the damages award adopted by the court in *Sotloff II*. This amount reflects a 20% enhancement over the pain and suffering awards granted in the Sotloff and Foley cases. Given the duration and nature of the sexual torture leading up to the death of Kayla Mueller, I suggest that such an enhancement is reasonable. Based on the testimony and expert evidence cited above I believe that a pain and suffering award of $60 million is appropriate and consistent with prior awards in comparable cases and properly reflects the extraordinary circumstances in this case. Further, consistent with the methodology applied in *Sotloff II*, I propose an additional award amount as requested by the plaintiffs, of $5.52 million, for a total award of $65.52 million.

C.    NON-ECONOMIC/SOLATIUM DAMAGES:  CLAIMS OF FAMILY MEMBERS OF DIRECT VICTIM

1.    LEGAL FRAMEWORK

Section 1605A(c) of the FSIA expressly provides for solatium damages to immediate family members of the victims.  Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort.  *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted).

The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco*, 154 F. Supp. at 36 n.8).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish.  As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

Immediate family members need not be present at the attack in order to be eligible for solatium damages. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (*Cohen I*) ("Solatium claims are typically brought by family members who were not present or injured themselves"); *id*. at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

Accordingly, an immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi* 77 F. Supp. 3d at 72-73 (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

The case law in this Circuit outlines the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks. Solatium damages vary based on numerous factors including "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*"). In *Heiser I*, the court conducted a survey of

decisions of the district courts in the District of Columbia circuit and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Heiser I*, 466 F. Supp. 2d at 269 (footnotes omitted). These amounts are considered guideposts in evaluating damages and are neither mandatory nor applicable in all cases. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018).

The amount of solatium damages may be enhanced where there are more extreme circumstances, such as where a family member is under medical care for emotional or psychological injury; or the testimony demonstrates that the family member continues to experience and feel the loss as if it had just occurred; or where the family member is aware of the victim's extreme suffering while captive. *See*, *e.g.*, *Sotloff II*, No. CV 16-725 (TJK), 2023 WL 2727599, at *2 (confirming Special Master's recommended 50% enhancement to solatium damages award to immediate family of Stephen Sotloff due to the significant emotional injuries suffered due to Sotloff's torture, 50% enhancement to solatium damages awarded to James Foley's parents for their emotional devastation as a result of Foley's captivity and death, and 30% enhancement to solatium damages award to Foley's siblings due to their ongoing suffering and significant alteration of their lives); *Sheikh v. Republic of Sudan*, 2020 WL 5203496, at *9 (D.D.C. Aug. 31, 2020) ("In general, factors that recommend the awarding of an enhancement include 'evidence establishing an especially close relationship between the plaintiff and decedent …; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing'").

A review of relevant cases indicates that upward enhancements have generally ranged from approximately 20% to 50% and that in cases awarding greater enhancements, courts have placed particular emphasis on circumstances such as the lack of knowledge of the fate of the victim and the brutality of the treatment and death of the victim. *See, e.g.*, *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020) (awarding 20% enhancement where sibling spent months assisting injured brother and as a result lost his job and marriage); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) (upward enhancement of 25% where parents suffered ongoing depression requiring medication and siblings suffered emotional and behavioral effects; noting also that family members at the scene of the attack may be awarded an additional amount – characterized as a separate component of damages); *Flanagan v. Islamic Republic of Iran,* 87 F. Supp. 3d 93 (D.D.C. 2015) (25% upward departure where relatives suffered from persistent complex bereavement-related disorder and PTSD following victim's death); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (awarding additional amount to spouse who was present at the scene of the attack); *Estate of Brown v. Islamic Republic of Iran,* 872 F. Supp. 2d 37 (D.D.C. 2012) (upward departure where sibling suffered nervous breakdown and was prescribed medication for approximately one year); *Oveissi I*, 768 F. Supp. 2d at 30 (awarding 50% enhancement where the child of the victim was uprooted and family was forced to go into hiding to avoid further attacks and therefore was unable to grieve in the normal manner); *Stansell v. Republic of Cuba,* 217 F.Supp.3d 320 (D.D.C. 2016)  (50% enhancement in award to spouse where spouse had unquestionably close relationship with the victim and where the pain and suffering were magnified by the initial lack of information surrounding his death and where she worked for years with the FBI to learn exactly what happened to her husband); *Warmbier*, 356 F. Supp. 3d at 59 (D.D.C. 2018) (awarding $15 million to each parent of the victim (an enhancement

of 300%) where parents had no knowledge of the fate of their son while he was in detention, the parents "constantly worried about their son, unsure of what was happening to him" and had "first-hand observations and acute memories of [their] child's death.").

The solatium awards must therefore be determined with reference to the baseline framework values but taking into consideration the particular facts of the case. As with the recommendation with respect to the pain and suffering damages for the Estate of Kayla Mueller, I believe that the solatium damages analysis in the Sotloff and Foley cases is instructive and relevant here.

## 2.    OVERVIEW

Each of the Plaintiff family members has provided clear, credible, and compelling deposition testimony demonstrating their close relationship with Kayla Mueller and the effects of her kidnapping, captivity, and death on their own lives, on their relationships, and on their emotional well-being. Following are my recommendations regarding solatium damages and the basis for each proposed award.

## 3.    RECOMMENDED SOLATIUM AWARDS

### i.    Recommended Solatium Awards for Marsha and Carl Mueller - Parents of Kayla Mueller.

Based on the uncontroverted evidence, the parents of Kayla Mueller have demonstrated the close familial relationship that supports solatium awards in FSIA cases. The baseline *Heiser* award for parents of a victim killed by terrorists is $5 million. In this case, however, an enhanced award is appropriate. Kayla Mueller's parents suffered through her kidnapping and captivity for nearly 18 months. During that time, they did not know where she was, they sought in vain to obtain her freedom with no real assistance. They suffered extreme emotional upheaval – initially holding on to hope after meeting with the government and seeing other non- American hostages released only

to lose hope over time as their efforts to seek her return failed. They suffered through unclear reports of Kayla's death and uncertainty surrounding the fact and manner of her death. They have suffered and continue to suffer knowing the extreme torture that Kayla experienced. Their family unit has been broken and they continue to experience the emotional trauma of her death. All families of victims of terrorism experience great loss and agony – but those families whose loved ones are held in captivity, are tortured, and then are killed experience prolonged agony: "Families of torture and hostage-taking victims are typically awarded greater damages than are the families of victims of a single attack," because in the former cases, "the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." *Warmbier*, 356 F.Supp. 3d at 59 (citing *Oveissi I*, 768 F.Supp.2d at 27). In light of the evidence and circumstances, and a comparison of the pertinent case law, I recommend a solatium award for each of Marsha and Carl Mueller in the amount of $7,500,000 – a 50% enhancement over the *Heiser* baseline value.

### ii. Recommended Solatium Damages for Eric Mueller – Brother of Kayla Mueller.

Eric Mueller testified about the long term and ongoing effects of his little sister's kidnapping and murder. He demonstrated the close familial relationship that supports an award of solatium damages in an FSIA case. He testified that the murder of his sister has strongly affected his family relationships. His testimony shows that he has suffered profound psychological damage – to the point where he had to seek professional help and use medications to function. He continues to suffer from psychological damage. He felt utterly helpless when Kayla was in captivity and continues to suffer from nightmares. He struggles with the publicity about Kayla's death and about

how to tell his young daughter about her aunt Kayla.  He fears retribution from ISIS and at times is unable to leave his house.

Based on this compelling testimony, the extraordinary circumstances, the ongoing pain and suffering, and the long duration of suffering while Kayla was held captive, I recommend an enhanced award for Eric Mueller of $3,125,000.  This represents a 30% enhancement over the baseline *Heiser* award.

## PREJUDGMENT INTEREST

Plaintiffs seek prejudgment interest on all components of compensatory damages. Complaint, ECF No. 1, at 20.  The decision to award prejudgment interest, as well as how to compute that interest, "rests within the discretion of the court, subject to equitable considerations." *Fritz I*, 324 F.Supp.3d at 63 (*quoting Baker*, 775 F.Supp.2d at 86). Courts have differed regarding the propriety of pre-judgment interest in FSIA cases and courts have also differed as to the rationale for such awards and the types of damages to which such awards should apply.  *See, e.g.*, *Barry v. Islamic Republic of Iran*, 437 F.Supp.3d 15, 60 (2020) ("Courts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits.")  *See also Doe A-1 v. Democratic People's Republic of Korea*, 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) ("Courts in this district have taken varying approaches to requests for prejudgment interest").

Prejudgment interest has generally been justified as a means of accounting for the delay in payment resulting from the litigation.  "Where courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which the claimants received relief." *Barry*, 437 F. Supp. 3d at 60 (citing *Reed*, 845 F. Supp. 2d at 214 (citing *Pugh*, 530 F. Supp. 2d at 263-; *Baker*, 775 F. Supp. at 86).  "'The purpose

of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation.'" *Fritz I*, 324 F. Supp. 3d at 63 (*quoting Oldham v. Korean Air Lines Co*., 127 F.3d 43, 54 (D.C. Cir. 1997)).   "Accordingly, '[p]rejudgment interest is an element of complete compensation.'" *Fritz I*, 324 F. Supp. 3d at 63 (*quoting Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 59 (D.D.C. 2012) (*quoting West v. United States*, 479 U.S. 305, 311-12, 107 S. Ct. 702, 93 L.Ed.2d 639 (1987))). *See also Kinyua,* 466 F. Supp. 3d at 12 ("'A solatium award is therefore best viewed as fixed at the time of the loss,' … and plaintiffs are entitled to the full amount of their award as if they received it in 1998. Failing to do so would not only place the present plaintiffs at a disadvantage relative to their family members in earlier litigation, but would also allow the Iranian defendants 'to profit from the use of the money over the past [two] decades.'") (quoting *Fritz I*, 324 F. Supp. 3d at 64 and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013)).  *See also Sheikh*, 485 F. Supp. 3d at 274 (stating, in an action arising from 1998 embassy bombings, that "this Court will follow its general practice. As the Court observed recently, 'plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury,' and failure to award prejudgment interest would 'allow the Iranian defendants to profit from the use of the money over the last [two] decades.'") (quoting *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (addressing embassy bombing claims)); *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at \*19-20 (D.D.C. July 2, 2020) (stating, in action arising out of 1996 bombing of Khobar Towers, that "[f]ailing to award prejudgment interest would place plaintiffs at a disadvantage relative to plaintiffs in earlier litigation"); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n.10-12 (Bates, J.) (awarding prejudgment interest to victims of embassy bombings); *Wamai*, 60 F. Supp. 3d at 98 (Bates, J.) (stating, in action brought by victims of embassy bombings, that "[p]rejudgment interest is

appropriate on the whole award, including pain and suffering and solatium" and past economic loss, but not on present economic loss); *see also Fritz I*, 324 F. Supp. 3d. at 64 (Moss, J.) (awarding prejudgment interest on the past economic loss of the direct victims abducted and murdered in Iraq as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families); *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13 (D.D.C. 2020) ("*Fritz II*") (Moss, J.) (finding additional family member entitled to damages and following *Fritz I* in awarding prejudgment interest); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (Friedman, J.) (awarding prejudgment interest in action arising from suicide bombing in Israel).

Conversely, some courts have concluded that prejudgment interest is not appropriate because the "values set by" the *Heiser* framework "represent the appropriate level of compensation, regardless of the timing of the attack … These courts emphasize that 'pain and suffering and solatium damages are both designed to be fully compensatory.'" *Barry*, 437 F. Supp. 3d at 60 (citing *Oveissi I*, 768 F. Supp. 2d at 30 n.12.; *Wyatt*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *Schertzman Cohen v Islamic Rep. of Iran*, 2019 WL 3037868, at *10 (D.D.C. July 11, 2019); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 43 (D.D.C. 2012); *Thuneibat*, 167 F. Supp. 3d 22, 54; *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 45–46 (D.D.C. 2018) ("*Akins I*"); *Akins v. Islamic Republic of Iran*, 549 F.Supp.3d 104, 121-22 (D.D.C. 2021) ("*Akins II*"), (denying motion to, *inter alia,* add prejudgment interest to baseline awards finding that the "majority of Judges confronted with this issue have concluded—as this Court did in *Akins*—that 'pain and suffering and solatium damages are both designed to be fully compensatory.'") (quoting *Barry*, 437 F. Supp. 3d at 60).

The Plaintiffs have requested that prejudgment interest be computed using the methodology applied in *Sotloff II*. In that case, the amount of prejudgment interest was evaluated separately for each component of damages based on whether the recommended damages can be viewed as fully compensatory without prejudgment interest.

- **Past Economic Loss.** Past economic loss is defined as the loss that existed as of the date of the abduction of the victim up until the date on which the economic loss was computed by the expert. Past economic loss is expressed as a nominal dollar amount and is not reduced to present value. Accordingly, it would be appropriate to apply prejudgment interest to the past loss (which is not adjusted by any interest factor) in the economic loss report.

- **Future Economic Loss**: Future economic loss is expressed in terms of a present value – and the discount factor is applied to each year of loss back to the date of the economic loss computation. Application of prejudgment interest at a different rate would alter the present value computation and create an inconsistent loss calculation.[7] Accordingly, it is not appropriate to apply prejudgment interest to future economic loss.

- **Pain And Suffering Damages For The Direct Victim.** In this case, the pain and suffering damages recommended for the Victim represents past damage – it does not have an ongoing component (which might be included in a pain and suffering award for an injured, living victim). Here, the pain and suffering amount is fixed as of the date of the death of the Victim. This loss therefore is intended to account for the full pain and suffering of the victim as of the date of death in 2015. It would be reasonable, therefore, to apply

---

[7] In this case, the future loss is assumed to start after 2021 – the date of the economic loss report.

prejudgment interest to the pain and suffering loss amount to account for the delay in compensation for a loss fixed in 2015.

- **Solatium damages.** Solatium damages present a somewhat more complex issue. Solatium damages are intended to compensate for grief and loss – not limited in time. The recommended amount of solatium damages accounts for the permanence of the loss and the ongoing grief. In that sense, the rationale for prejudgment interest as a necessary factor to make the plaintiff whole and bring the loss value to the present time does not inevitably apply. For this reason, some courts have found that solatium damages are by their nature fully compensatory and thus an award of prejudgment interest is not necessary to fully compensate the plaintiffs. *See Winternitz*, 2022 WL 971328, at *12.[8] In this case, I am mindful of the fact that the grief and loss commenced more than a decade ago – and the family member Plaintiffs have continued to suffer throughout that period – only now close to reaching an end to the only means they have to seek a form of justice. I suggest it would not be inappropriate to apply prejudgment interest to the solatium award but note that it is a discretionary matter and one could reasonably reach a different conclusion. [9]

---

[8] *See also Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *37 (D.D.C. Aug. 15, 2023) ("[D]amages for pain and suffering and solatium "do not typically require prejudgment interest because they are designed to be fully compensatory.") (internal quotations omitted) (quoting *Thuneibat*, 167 F. Supp. 3d at 54); *Ackley v. Islamic Republic of Iran*, No. 20-CV-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (same).

[9] *See, e.g., Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (concluding "that an award of prejudgment interest here is appropriate" because "plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury," and the "[f]ailure to do so would also allow the … defendants to profit from the use of the money" in the intervening years) (quoting *Doe*, 943 F. Supp. 2d at 184 n.1)

For the Court's consideration, I have provided a calculation of prejudgment interest from the date of abduction through May 2024 at the applicable federal prime rate for the Direct Victim's pain and suffering damages and past economic loss damages.  I have also included for the Court's consideration a computation of prejudgment interest on the recommended solatium damages.

Prejudgment interest is calculated at the prime rate for each year from the date of Kayla Mueller's abduction using the methodology described in *Fritz I*, 324 F. Supp. 3d at 64, 67 n. 2. [10] A multiplier was calculated using the Federal Reserve's data for the average annual prime rate from the date of abduction through May 2024.  *See* Bd. of Governors of the Fed. Reserve Sys., Historical                    Data,                    available                    at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.[11]

I multiplied $1.00 by the prime rate in 2013 and then multiplied the resulting product by the percentage of the days of the year remaining as of the date of the attack.  I then added that

---

[10] *See also Fritz v. Islamic Republic of Iran*, No. CV 15-456 (RDM), 2018 WL 5046229, at *26 (D.D.C. Aug. 13, 2018), (awarding prejudgment interest from the date of the respective abductions for each victim), *report and recommendation adopted as modified*, 324 F. Supp. 3d 54, 64 (D.D.C. 2018) ("Plaintiffs were theoretically entitled to the full amount of their solatium awards in 2006 (when Al-Taie was abducted) and 2007 (when Fritz, Chism, and Falter were abducted and killed), and thus prejudgment interest is appropriate to account for the time that they have not had access to that full amount.")

[11] The rates applied are as follows:
  2013:  3.25 (applied from the date of abduction)
  2014:  3.25
  2015:  3.26
  2016:  3.51
  2017:  4.10
  2018:  4.91
  2019:  5.28
  2020:  3.54
  2021:  3.25
  2022:  4.86
  2023:  8.20
  2024: 8.50 (current rate)

product to $1.00. Next, I multiplied that amount by the prime rate the following year and added that amount. Continuing this iterative process through May of 2024 yields a multiplier of 1.6368. As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award." *Wamai*, 60 F. Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12.

## SUMMARY OF RECOMMENDATIONS

| VICTIM | SECTION 1 - PAIN AND SUFFERING | | | SECTION 2A - PAST ECONOMIC LOSS | | | SECTION 2B - FUTURE ECONOMIC LOSS | TOTALS | |
|---|---|---|---|---|---|---|---|---|---|
| | PAIN AND SUFFERING | PREJUDGMENT INTEREST ON PAIN AND SUFFERING | PAIN AND SUFFERING WITH PREJUDGMENT INTEREST | PAST ECONOMIC LOSS | PREJUDGMENT INTEREST ON PAST ECONOMIC LOSS | PAST ECONOMIC LOSS WITH PREJUDGMENT INTEREST | FUTURE ECONOMIC LOSS (No Prejudgment Interest) | TOTAL WITHOUT PREJUDGMENT INTEREST | TOTAL WITH PREJUDGMENT INTEREST ON PAIN AND SUFFERING AND PAST ECONOMIC LOSS |
| Estate of Kayla Mueller | $65,520,000.00 | $41,724,767.89 | $107,244,767.89 | $75,533.00 | $48,101.30 | $123,634.30 | $1,049,667.00 | $66,645,200.00 | $108,418,069.19 |

| FAMILY MEMBERS | SOLATIUM DAMAGES | PREJUDGMENT INTEREST ON SOLATIUM DAMAGES | SOLATIUM WITH PREJUDGMENT INTEREST |
|---|---|---|---|
| Marsha Jean Mueller | $7,500,000.00 | $4,776,186.80 | $12,276,186.80 |
| Richard Carl Mueller | $7,500,000.00 | $4,776,186.80 | $12,276,186.80 |
| Eric Robert Mueller | $3,125,000.00 | $1,990,077.83 | $5,115,077.83 |

Dated: June 7, 2024                              Respectfully submitted,

                                                 By: *Deborah E. Greenspan*
                                                 Deborah E. Greenspan, Esq.
                                                 Special Master

                                                 **BLANK ROME LLP**
                                                 D.C. Bar # 391399
                                                 1825 Eye Street, N.W.
                                                 Washington, DC  20006
                                                 Telephone: (202) 420-2200
                                                 Facsimile: (202) 420-2201
                                                 Deborah.Greenspan@blankrome.com